Alfredo SANTOS, Plaintiff,

v.

**CITY OF HOUSTON, TEXAS,
a Municipal Corporation,
Defendant.**

Civ. A. No. H–89–1245.

United States District Court,
S.D. Texas,
Houston Division.

March 31, 1994.

Hollis Katzmann, Clint Bolick, Washington, DC, Mark Bredemeier, Kansas City, MO, Jeffrey A. Davis, Houston, TX, for plaintiff.

Gilbert D. Douglas, Houston, TX, for defendant.

### *ORDER & MEMORANDUM*

RAINEY, District Judge.

Pending before the Court are Defendant's Motion for Summary Judgment (Dkt. entry # 11) and Plaintiff's Motion for Summary Judgment (Dkt. # 13).

Having reviewed the parties' motions, responses, and the applicable law, the Court finds that Plaintiff's Motion for Summary Judgment should be granted and Defendant's Motion for Summary Judgment should be denied.

## Factual Background

In the early 1900's, the City of Houston was served by motor vehicles called jitneys.[1] In 1924, under pressure from the streetcar companies, the City of Houston enacted Ordinance # 1137–B (the "anti-jitney ordinance" or "ordinance"). The ordinance was passed by a referendum of the voters. The admitted objective of the ordinance was to protect streetcar companies from competition.

The ordinance contains two operative clauses. The first provides that no jitney is allowed to operate on a street that has streetcar tracks. The second provides that no jitney with a seating capacity of less than 15 passengers may be operated on the streets of Houston. Because there are no remaining streetcar tracks in Houston, the first clause is obsolete. However, the second clause has effectively banned all jitney operations in the City of Houston.

Since its inception, the City has granted exceptions to the ordinance when circumstances made it convenient or exigent. In 1949, and again in 1974, the City ignored the ordinance and granted temporary permits to jitney services during transit strikes. Although this allowed jitneys on the streets for only a short time, the City has allowed similar types of transportation services to operate through the years. For a period of time prior to 1983, for example, the City operated a mini-bus system for the transport of passengers inside the central business district for 10 cents a ride. This was a successful operation that had to be discontinued due to problems with the efficiency of the vehicles being used. Since that time, the Metropolitan Transit Authority ("MTA") has operated a "Shopper's Special" that is similar in concept to the mini-buses, but limited in its service. There are many van pool and ride share programs in Houston, in addition to the numerous hotel and motel courtesy vans, air transport vans, delivery vans, handicapped vans, and garage parking vans. In 1983, there were over 1500 vans operated by 79 companies in the Houston area, and that number may be much higher today.

From 1983 to 1984, Alfredo Santos operated a jitney service along Westheimer Avenue in the Galleria shopping area and along Harrisburg Street in a predominantly Hispanic area of east Houston. He offered this service using a leased taxicab, charging one ($1.00) dollar for up to five miles along these routes. At this same time, the bus fare for the same distance was approximately fifty-five ($.55) cents and the fare for a five-mile taxi ride was approximately five ($5.00) dollars.

Mr. Santos discontinued the operation of his jitney service after allegedly being threatened with the loss of his license to operate a taxi by a city official. He then filed this lawsuit. In his complaint, Mr. Santos urges the Court to declare the anti-jitney ordinance of 1924 unconstitutional and permanently enjoin the City from enforcing the ordinance. He contends that the ordinance violates the federal anti-trust laws and his substantive due process and/or equal protection rights under the United States and/or Texas Constitutions.[2]

## Anti-trust Claim

Plaintiff's anti-trust claim is based on the Sherman Act, 15 U.S.C. § 2, which makes any conduct that tends to "monopolize, or attempt to monopolize ... any part of the trade or commerce among the several states" unlawful.[3]

---

1. A jitney is commonly a small bus designed to carry paying passengers over a fixed route, according to a flexible schedule, for a flat fee.

2. This is not the first time Ordinance # 1137–B has been scrutinized. In *Davis v. City of Houston,* 264 S.W. 625 (Tex.Civ.App.—Galveston 1924, no writ), jitney owners and operators and citizens who used the jitney services attacked the validity of the statute, asserting, *inter alia,* that the Ordinance (1) invaded their property rights

and (2) was not legally passed or adopted, and therefore invalid. Although the *Davis* Court found the Ordinance valid and enforceable, its decision is not controlling.

3. Plaintiff originally claimed that the City's anti-jitney ordinance violated both federal and state anti-trust laws. However, Plaintiff has voluntarily dismissed his state claim. (Dkt. # 16, p. 7 n. 8).

## A. Jurisdiction under the Sherman Act

■ The Court's first task is to determine whether jurisdiction exists under the Sherman Act. Defendant directs the Court to *U.S. v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), to support its argument that local transportation services, such as a jitney business, do not "affect interstate commerce;" therefore, acts tending to monopolize such services do not come within the jurisdiction of the Sherman Act. The U.S. Supreme Court in *Yellow Cab* did determine that an alleged conspiracy to monopolize a local cab service in Chicago did not come within reach of the Sherman Act. 332 U.S. at 233, 67 S.Ct. at 1568. The Court did not intend to pronounce a broad-sweeping rule in this regard, however. Instead, the Court attempted to limit its holding to the facts therein, by distinguishing between two different cab services, only one of which came within reach of the Sherman Act:

> We do not mean to establish any absolute rule that local taxicab service *to and from railroad stations* is completely beyond the reach of federal power or even beyond the scope of the Sherman Act ...
>
> \* \* \* \* \* \*
>
> All that we hold here is that when local taxicabs merely convey interstate train passengers *between their homes and the railroad station* in the normal course of their independent local service, that service is not an integral part of interstate transportation.

*Id.* at 232–33, 67 S.Ct. at 1568.

Subsequent case law further reflects the U.S. Supreme Court's continuing desire to strengthen, rather than restrict, the power of the Commerce Clause. For example, in *Katzenbach v. McClung*, 379 U.S. 294, 296, 85 S.Ct. 377, 379–80, 13 L.Ed.2d 290 (1964), the Court determined that a local restaurant in Birmingham, Alabama which engaged in discriminatory practices "affected interstate commerce" because it served food which had moved in interstate commerce. Likewise, the Court in *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), held that a motel which

engaged in discriminatory practices also "affected interstate commerce," stating:

> [C]onditions of transportation and commerce have changed dramatically, and we must apply those principles to the present state of commerce ...
>
> \* \* \* \* \* \*
>
> [t]he transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress ...
>
> [t]he power of Congress over interstate commerce is not confined to the regulation of commerce among the states ...
>
> [t]he power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the State of origin and destination, which might have a substantial and harmful effect upon that commerce.

379 U.S. at 251, 256–58, 85 S.Ct. at 354, 357–58.

In discussing the extent to which the wrongful conduct must "affect interstate commerce" to trigger Congress' far-reaching power over local matters, the *McClung* Court stated that "viewed in isolation," the local restaurant's purchase of out-of-state goods was insignificant, but its contribution to the commercial demand for such products, "taken together with that of many others similarly situated, [was] far from trivial." 379 U.S. at 300, 85 S.Ct. at 382 (*quoting, in part, Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)).

This principle was exemplified in the more recent case of *Cowan v. Corley*, 814 F.2d 223 (5th Cir.1987), in which a local wrecker service sued the Sheriff of Montgomery County after being denied wrecker assignments. Although the activities in *Cowan* appeared wholly local in nature, they posed a sufficient threat to the free flow of interstate commerce to invoke jurisdiction under the Sherman Act.

In this case, the jitney prohibition affects the carriage of passengers on interstate highways, and between airports, train stations, and bus stations. The ordinance prevents prospective out-of-state entrepreneurs from entering the area to establish and maintain

jitney services. Additionally, the vehicles and the gasoline used in such a business would probably originate from other states, at least in part. In Mr. Santos' service, passengers included shoppers in the Galleria area of Houston who were probably either travelers themselves, or local persons carrying goods which had moved in interstate commerce. Thus, the Court finds that the City's prohibition of jitney services does inhibit interstate commerce, and the Sherman Act does apply to this case.

## B. *Sherman Act violation*

■ The next question becomes whether the City's conduct violates the Act; and, if so, whether one of the narrow exceptions to the Act applies.

■ A violation of the Sherman Act is established upon a showing of monopoly power in a relevant market, and that the party possessing the monopoly power has or intends to use such power to unreasonably restrict or eliminate competition in the market. *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 389–91, 76 S.Ct. 994, 1003–05, 100 L.Ed. 1264 (1956); *Dimmitt Agri Industries, Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 525 (5th Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983).

The relevant market at issue in this case is the market of fixed and semi-fixed route ground transportation services within the City of Houston. The City's ability to control the market is quite clear, and the City intended to exercise its power to eliminate competition with the streetcar companies by excluding jitneys. The City attempts to justify its action by stating that it "does not 'exclude' jitneys, but rather only limits the passenger capacity of the vehicles utilized." (Dkt. # 11 at 14). However, the evidence herein shows that such limitation is fatal to the jitney industry, and amounts to a *de facto* prohibition. (Dkt. # 14, App. 2 at 5). Both the intent and the effect of the ordinance was to put jitney services out of business. The Court finds that the City's ordinance violates § 2 of the Sherman Act.

## C. *State Action Exemption*

■ The City contends, however, that it is exempt from enforcement of the Sherman Act, even if a violation exists. A "state action exemption," as pronounced in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), may apply to a municipality when: (1) the state legislature has "clearly articulated and affirmatively expressed" a state policy granting the municipality the power to legislatively displace competition within a particular regulated area; and (2) the municipality has not unreasonably exercised such authority. *Indep. Taxi v. Greater Houston*, 760 F.2d 607, 611 (5th Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985); *see Community Communications Co. v. City of Boulder*, 455 U.S. 40, 51–53, 102 S.Ct. 835, 841, 70 L.Ed.2d 810 (1982); *see also City of LaFayette v. La. Power & Light Co.*, 435 U.S. 389, 409–10, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978).

■ In *Parker*, a state statute which imposed restraints on the raisin market was upheld, pursuant to a state policy to stabilize the market and prevent agricultural waste. *Parker*, 317 U.S. at 355, 63 S.Ct. at 315–16. In subsequent cases involving municipal action, however, the U.S. Supreme Court has tightened the reins on the authority of municipal governments. In *LaFayette*, the Court stated:

> Cities are not themselves sovereign; they do not receive all the federal deference of the State that create them ... the States' subdivisions generally have not been treated as equivalents of the States themselves.

At 412, 98 S.Ct. at 1136. Thus, a municipality will not receive the same deference as a state unless it acts pursuant to state policy. *Boulder*, 455 U.S. at 54, 102 S.Ct. at 842. Active state supervision is not required, but the state must affirmatively address the issue at hand and clearly articulate its position. *Id.* at 55–56, 102 S.Ct. at 843; *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 45, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985).

### 1. *Statutory authority*

In this case, the City relies on statutory authorization by the State to maintain "exclusive control and power" over city streets,

alleys, public grounds and highways, and to regulate motor vehicles using such streets. See Tex.Rev.Civ.Stat.Ann. art. 1016 (Vernon Supp.1994); see also Tex.Rev.Civ.Stat.Ann. art. 1175 (Vernon 1963 & Supp.1994).

In determining whether this grant of statutory authority is sufficient under Parker, the Court is guided by the Independent Taxi case in which the Fifth Circuit clarified perplexing issues such as (1) how specific a statutory authorization must be, and (2) whether statutory "permission," versus "compulsion," is sufficient. Following Eau Claire, the Fifth Circuit stated that "clearly articulated state policy" may constitute mere authorization, rather than a mandate. See Indep. Taxi, 760 F.2d at 610. The Court further opined that statutory authorization need not be so specific as to address every conceivable factual scenario that may arise in the realm of public transportation; the statute need only reflect that the legislature contemplated the kind of municipal action complained of. Id. (citing Eau Claire, 471 U.S. at 43–44, 105 S.Ct. at 1719). Applying these principles, the Court in Independent Taxi found that the statutes granting the City regulatory control over taxicabs and airport management strongly reflected the state's desire to authorize the type of municipal action involved therein. Id. at 611.

The statutory authority relied upon by the City herein also reflects the State's desire to give the City exclusive regulatory power over public ground transportation. Although the statutes are not specific as to the types of vehicles regulated and the manner of regulation, such specificity is not required. Nor do the statutes contain a mandate to displace competition in fixed and semi-fixed route transportation services, but a mandate is not necessary. The State has clearly authorized the City to regulate its streets, and the Court finds that such authorization is sufficient to satisfy the Parker requirement of "clearly articulated and affirmatively expressed" state policy. The determination of Parker immunity therefore turns on whether the City has exercised such authority in a reasonable manner.

2. *Exercise of authority*

■ In the Independent Taxi case, the Fifth Circuit found the City of Houston immune from federal antitrust liability for its unequal treatment of taxicabs at Intercontinental Airport. See Indep. Taxi, 760 F.2d at 610. The Independent Taxi controversy arose as a result of the City's exclusive contract with Yellow Cab Company, in which the City (as owner and operator of Intercontinental Airport) granted Yellow Cab exclusive dominion over taxicab transportation at the airport. Two excluded groups of taxicab operators and owners sued both the City and Yellow Cab, seeking injunctive and monetary relief under the Sherman Act and Clayton Act. The City moved for summary judgment, urging immunity. The City's motion was granted, and the Fifth Circuit affirmed. Id. at 609, 611.

At first glance, the Independent Taxi scenario appears similar to the facts at hand. Closer scrutiny reveals distinguishing factors, however. In that case, the City used its authority to entirely, rather than selectively, displace competition in the airport taxi business. Its decision to enter into an exclusive contract arose as a result of an influx of taxicab service at the airport when it opened. The exclusive contract was a way to control the efficiency of ground transportation at the airport. Id. at 611. The City's actions were decisive, a legitimate goal (efficient ground transportation at the airport) was achieved, and the City's action in excluding other taxicab services was consistent and not arbitrary.

In this case, the intended purpose of the anti-jitney ordinance was to protect the streetcar companies from competition. Obviously, the utility of the ordinance ceased to exist when the streetcars were put out to pasture; and, the ordinance is *not* effectively achieving the City's alleged current objective, which is traffic safety.

Plaintiff concedes that the City has the authority to regulate public ground transportation to ensure safety. However, there is no evidence showing that jitneys were unsafe before they were banned, and there is no evidence that jitneys would currently pose any greater threat than similar vehicles oper-

ating on city streets today. The City contends that taxicabs are somehow safer than jitneys, but Plaintiff's jitney *was* a taxi, and the fact that jitneys generally provide service along fixed routes may make them even safer than taxicabs. Both types of services stop often to pick-up and discharge passengers, but other drivers that frequently travel the area would recognize the jitneys and become aware of their routine stops. Many delivery, airport, and share ride vans also make frequent stops on city streets, but to single out jitneys as unsafe without any supporting evidence is irrational.

■ The City's reasoning is further diluted by its arbitrary enforcement of the ordinance. The 15 passenger limit in the ordinance could apply to many types of vehicles currently operating on city streets, but city officials are unsure which vehicles may be classified as jitneys. Van pools, for example, are allowed to operate freely, even though past city officials were not sure whether such services came within the legal definition of a jitney under the ordinance. (Dkt. # 11, Jt. Stip. D, E). As a result, the ordinance has been randomly enforced throughout the years, and the City's actions have been far from decisive. Unlike *Independent Taxi*, the City in this case has selectively displaced competition without any reasonable basis. Arbitrary enforcement, without any recognizable benefit, is simply not a reasonable exercise of authority. Thus, the City is not immune from liability under the *Parker* doctrine.

In sum, the Court finds that the ordinance does violate the Sherman Act, and the violation does not come within the state action exemption because the City has not reasonably exercised its regulatory authority.

### Fourteenth Amendment Claims

Plaintiff further claims that the anti-jitney ordinance deprives him of his economic liberty and violates his substantive due process and equal protection rights.

#### A. *Liberty interest*

■ Deprivation by the state of a protected interest in life, liberty, or property is a prerequisite to a claim for denial of due process. *Shelton v. City of College Station,* 780 F.2d 475, 479 (5th Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566, 479 U.S. 822, 107 S.Ct. 89, 93 L.Ed.2d 41 (1986). Defendant contends that Plaintiff has not met this threshold requirement because he has no constitutional right to use public streets for private profit. If Plaintiff were claiming a "property" interest, the Court might agree with Defendant. However, Plaintiff is claiming deprivation of a "liberty" interest, and the courts have consistently held that the opportunity to pursue one's livelihood is a constitutionally protected liberty interest, which may not be arbitrarily denied. *Cowan,* 814 F.2d at 227.

#### B. *Rational basis test*

■ Under both due process and equal protection analyses, a statute (or ordinance) is constitutionally sound if the legislation has a rational relationship to a legitimate governmental purpose. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Harper v. Lindsay,* 616 F.2d 849, 854 (5th Cir.1980). If the law does not have a rational relationship to a legitimate goal of government, the law may be held unconstitutional. *See Harper,* 616 F.2d at 854. The courts must begin with the presumption that the statute in issue rests on some rational basis. *U.S. v. Carolene Products Co.,* 304 U.S. 144, 151–52, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938). The courts should not substitute their evaluation of legislative facts for that of the legislature, and the law must be upheld if the legislative decision was rationally related to a legitimate public interest. *Shelton,* 780 F.2d at 477; *Clover Leaf,* 449 U.S. at 458–60, 101 S.Ct. at 721. However, the presumption of constitutionality is rebuttable on a showing that the legislation or regulation is arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. *Shelton,* 780 F.2d at 480.

■ Under the Fourteenth Amendment's protective wing of equality, a statute based on pure favoritism which creates a

closed class will likely be declared unconstitutional. *Clover Leaf,* 449 U.S. at 470, 101 S.Ct. at 727 (if state law purporting to promote environmental purpose is in reality 'simple economic protectionism,' the courts apply a 'virtually per se rule of invalidity') (*citing Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978)). A regulatory statute which singles out a particular class, or makes distinctions in the treatment of business entities engaged in the same business activity, must bear a reasonable relationship to the underlying purpose of the statute, and that purpose must be legitimate. *City of New Orleans v. Dukes,* 427 U.S. 297, 301–03, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

 On its face, the ordinance in question appears to make a rather benign distinction between jitneys operating with a passenger capacity in excess of 15 passengers and those with a passenger capacity of less than 15 passengers. However, the intended effect of the ordinance was to "classify" jitneys out of business. The jitney business was a sacrificial lamb in a deal struck between City Council and the Houston Electric Company whereby the Houston Electric Company would resume street improvements and withdraw its claim for a fare increase in return for the City's abolishment of all jitneys. The purpose of the statute was economic protectionism in its most glaring form, and this goal was not legitimate.

As a result, jitneys have been excluded from operating on city streets, while numerous other forms of similarly situated business entities providing ground transportation have been operating without restriction. Those similarly situated include, but are not limited to, taxicabs, small metro buses used for transportation of the handicapped, mini-vans and medium-sized vans used as taxis, delivery vans, airport vans and limousines, parking garage vans, the shoppers special trolley, van pools, and hotel and motel courtesy vans. The City attempts to distinguish jitneys from other types of small body vehicles to justify the ordinance, but a lack of summary judgment evidence and plain common sense defy the City's logic. The classification is simply not rational.

The City alleges that the objectives presently being served by the anti-jitney law include safety and traffic flow relating to more frequent discharge and pick-up of passengers and lesser visibility of jitney vehicles because of their smaller size as opposed to larger buses. However, these alleged "current objectives" were far from the minds of city officials at the time of enactment, and they do not whitewash the illegality of the ordinance as it was originally enacted.

Assuming, however, that the City's alleged "current objectives" are real, the Court is still not convinced that the ordinance bears a substantial relationship to the public health, safety, or general welfare. In fact, the record establishes that the ordinance may be more detrimental than beneficial to the public, because the ordinance deprives the public of another form of public transportation which is desperately needed in the City of Houston. (Dkt. # 14, App. 8). The record further establishes that the 15 passenger limit has no substantial relationship to traffic safety. As discussed above, jitney services would pose no greater threat to public safety than other similarly situated services which are currently operating vehicles on city streets.

Even if some rational relationship between the ordinance and safety concerns did exist, however, the ordinance is enforced in an arbitrary and futile manner. Despite the uncertainty as to whether various transportation services currently operating in the City could be defined as jitney services, many services have been allowed to operate without restriction. Thus, the City has destroyed the alleged utility of the ordinance by its own actions.

The Court therefore finds that the ordinance, which was merely a result of the jitney business being used as a pawn in a chess game between the City and the Houston Electric Company, has no rational basis, even today. Alternatively, and perhaps equally important, the Court finds that the ordinance has long out-lived its ill-begotten existence. City officials concede that the ordinance is archaic and no longer relevant. (Dkt. # 11, Exh. C). Thus, even if the ordinance ever had a purpose, legitimate or not,

its utility has passed. *See Carolene,* 304 U.S. 144, 152–54, 58 S.Ct. 778, 784 (the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing that those facts have ceased to exist); *see also Chastleton Corp. v. Sinclair,* 264 U.S. 543, 544–49, 44 S.Ct. 405, 406, 68 L.Ed. 841 (1924) (a law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even if valid when passed).

Having resolved the federal constitutional claims, the Court finds it unnecessary to address the state constitutional claims. If the ordinance does not pass federal constitutional muster, it would certainly not pass state constitutional muster.

Accordingly, it is ORDERED that Plaintiff's Motion for Summary Judgment is GRANTED; Defendant's Motion for Summary Judgment is DENIED; and, the City of Houston is permanently enjoined from enforcing ordinance # 1137–B.