**F I L E D**

**PUBLISH**

**AUG 23 2004**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KIM POWERS; DENNIS BRIDGES;
MEMORIAL CONCEPTS ONLINE,
INC.,

           Plaintiffs - Appellants,

     v.

JOE HARRIS, in his official capacity
as President of the Oklahoma State
Board of Embalmers and Funeral
Directors; STEPHEN HUSTON,
CHARLES BROWN, TERRY
CLARK, CHRIS CRADDOCK,
KEITH STUMPFF, and SCOTT
SMITH, each in their official capacity
as a Member of the Oklahoma State
Board of Embalmers and Funeral
Directors,

           Defendants - Appellees.

No. 03-6014

THE CLAREMONT INSTITUTE
CENTER FOR CONSTITUTIONAL
JURISPRUDENCE; PACIFIC LEGAL
FOUNDATION,

           Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D. Ct. No. CIV-01-445-F)**

Clark M. Neily, III, Institute for Justice, Washington, DC (William H. Mellor, Institute for Justice, Washington, DC, and Andrew W. Lester, Lester, Loving & Davies, PC, Edmond, Oklahoma, with him on the briefs), appearing for Plaintiffs-Appellants.

Stefan K. Doughty, Assistant Attorney General, Oklahoma City, Oklahoma, appearing for Defendants-Appellees.

John C. Eastman, The Claremont Institute Center for Constitutional Jurisprudence, Orange, California, filed an amicus curiae brief.

Deborah J. La Fetra and Timothy Sandefur, Pacific Legal Foundation, Sacramento, California, filed an amicus curiae brief.

Before **TACHA**, Chief Circuit Judge, **McKAY,** and **TYMKOVICH**, Circuit Judges.

**TACHA**, Chief Circuit Judge.

Hornbook constitutional law provides that if Oklahoma wants to limit the sale of caskets to licensed funeral directors, the Equal Protection Clause does not forbid it. *See Fitzgerald v. Racing Assoc. of Cent. Iowa*, 539 U.S. 103, 109 (2003) (holding that the Equal Protection Clause does not prohibit Iowa's differential tax rate favoring the intrastate racetrack over the intrastate riverboat gambling industry); *Ferguson v. Skrupa*, 372 U.S. 726, 732-33 (1963) ("If the State of Kansas wants to limit debt adjusting to lawyers, the Equal Protection Clause does not forbid it."). Plaintiff-Appellants Kim Powers, Dennis Bridges, and Memorial Concepts Online, Inc. (collectively "Plaintiffs"), who wish to sell

-2-

caskets over the Internet without obtaining the licenses required by Oklahoma law, challenge the soundness of this venerable rule. Seeking declaratory relief, Plaintiffs sued Defendant-Appellees, who are members of the Oklahoma State Board of Embalmers and Funeral Directors ("the Board"), the relevant licensing authority. After a full bench trial, the District Court ruled for the Board. On appeal, Plaintiffs contend that Oklahoma's licensing scheme violates the Privileges and Immunities, Due Process, and Equal Protection clauses of the Fourteenth Amendment to the Federal Constitution. We take jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

The Oklahoma Funeral Services Licensing Act, Okla. Stat. tit. 59, § 395.1 *et seq.* ("FSLA"), and Board rules promulgated pursuant to the FSLA provide the regulatory scheme for the funeral industry in Oklahoma. Pursuant to the FSLA, any person engaged in the sale of funeral-service merchandise,[1] including caskets, must be a licensed funeral director[2] operating out of a funeral establishment.[3] *Id.*

---

[1]The FSLA defines funeral-service merchandise as "those products . . . normally provided by funeral establishments and required to be listed on the General Price List of the Federal Trade Commission, . . . including, but not limited to, the sale of burial supplies and equipment, but excluding the sale by a cemetery of lands or interests therein, services incidental thereto, markers, memorials, monuments, equipment, crypts, niches or outer enclosures . . . ." Okla. Stat. tit. 59, § 396.2(10).

[2]The FSLA defines a funeral director as "a person who: sells funeral

(continued...)

at § 396.3a; *see also id.* at § 396.6(A) (prohibiting sale of funeral merchandise without a license).[4]

Oklahoma does not, however, apply this licensing requirement to those who sell other funeral-related merchandise (e.g., urns, grave markers, monuments, clothing, and flowers). Furthermore, because the Board distinguishes between time-of-need and pre-need sales,[5] this licensing requirement does not apply to all

---

[2](...continued)
service merchandise to the public . . . ." Okla. Stat. tit. 59, § 396.2(2)(d).

[3]A funeral establishment is defined as "a place of business used . . . in the profession of . . . funeral directing . . . ." Okla. Stat. tit. 59, § 396.2(3).

[4]As the District Court noted:

By including all products normally provided by funeral establishments and required to be listed on the General Price List of the FTC (a list which includes caskets) within the definition of 'funeral service merchandise,' and by including anyone who sells such 'funeral service merchandise' within the definition of 'funeral director,' and by including the place of business of anyone who participates in 'funeral directing' within the definition of a 'funeral establishment,' the FSLA effectively requires that both a funeral director's license and a funeral establishment license be obtained from the Board before a person or entity may lawfully sell caskets. *Powers v. Harris*, CIV-01-445-F, 2002 WL 32026155 at 11 (W.D. Okla. Dec. 12, 2002) [hereinafter Dist. Ct. Op.]

[5] Time-of-need sales are those that are neither pre-death nor pre-paid (i.e., purchased and paid for at the time of the sale with delivery of the casket to occur at a future date). Pre-need sales, conversely, are those sales that are either pre-death or pre-paid.

casket sales.[6]  Specifically, although a person must be fully licensed to make time-of-need sales, [7] a salesperson may lawfully sell caskets pre-paid without a license so long as that person is acting as an agent of a licensed funeral director.

Finally, while the Board may issue orders to enforce the FSLA, *see id.* at § 396.2a, the FSLA limits its enforcement to intrastate casket sales only, Dist. Ct. Op. at 3 (finding of fact).  As such, an unlicensed Oklahoman may sell a time-of-need casket to a customer outside of Oklahoma—indeed, Plaintiffs have sold caskets to consumers located outside of Oklahoma—and an unlicensed salesperson who is not located in Oklahoma may sell a time-of-need casket to a customer in Oklahoma.  The requirement that a salesperson possess both a funeral director's license and operate out of a licensed funeral establishment applies, therefore, only to the intrastate sale of time-of-need caskets in Oklahoma.

Obtaining these licenses is no small feat.  According to the Board's rules, an applicant for a funeral director's license must complete both sixty credit hours

---

[6] The Oklahoma Insurance Code and the Insurance Commissioner regulate the sale of caskets on a pre-paid basis. *See generally* Okla. Stat. tit. 36, § 6121 *et seq.*; Okla. Admin. Code § 365: 25-9-1 *et seq.*  As such, the Board requires funeral directors who make funeral arrangements on a pre-need basis to comply with the Insurance Code and with the Insurance Commissioner's regulations. *Id.* at § 235:10-7-2(6).  The pre-paid sale of non-casket cemetery merchandise is governed by the Oklahoma Cemetery Merchandise Trust Act and by the State Banking Commissioner.  Okla. Stat. tit. 8, § 301 *et seq.*

[7] The FSLA and Board rules also require that a person be a licensed funeral director operating out of a funeral establishment to sell pre-death, but not pre-paid, caskets.

of specified undergraduate training[8] and a one-year apprenticeship during which the applicant must embalm twenty-five bodies. An applicant also must pass both a subject-matter and an Oklahoma law exam. *See generally* Okla. Admin. Code §§ 235:10-1-2, 10-3-1. Furthermore, to be licensed as a funeral establishment in Oklahoma, a business must have a fixed physical location, a preparation room that meets the requirements for embalming bodies, a funeral-service merchandise-selection room with an inventory of not less than five caskets, and adequate areas for public viewing of human remains. *See generally id.* at §§ 235:10-1-2, 10-3-2. In reflecting on these legislative and administrative regulations, the District Court concluded that "they evince an intent to forego laissez faire treatment of those sales and services when provided in this State. Limiting the sale of caskets to sellers licensed by the Board is, undeniably, a major component of that statutory scheme." Dist. Ct. Op. at 13.

Memorial Concepts Online, Inc. is an Oklahoma corporation created, operated, and owned by Ms. Powers and Mr. Bridges to sell funeral merchandise over the Internet.[9] It offers no other death- or funeral-related services, plays no

---

[8]The required mortuary science curriculum includes: embalming, restorative art, microbiology, pathology, chemistry, arranging funerals, psychology, grief management, funeral merchandise, and the funeral and burial practices of various religions.

[9]Because this is an Internet company, it maintains no physical storefront presence in the State of Oklahoma. Only the server is located there. The parties
(continued...)

role in the disposition of human remains, and is not licensed in Oklahoma as a funeral establishment. Although Ms. Powers, who lives in Ponca City, Oklahoma, has many years of experience selling caskets on a pre-need basis as the agent of a licensed Oklahoma funeral director, she is not licensed by the Board as either a funeral director or as an embalmer. Likewise, although Mr. Bridges has been a licensed funeral director in Tennessee for over twenty years, he is not licensed in Oklahoma. As a part of their current enterprise, Plaintiffs wish to sell in-state, time-of-need caskets to Oklahomans over the Internet. [10] They have foregone

---

[9](...continued)
have assumed, as do we for purposes of this appeal, that the server's location constitutes the Internet company's place of business. Hence, we need not address the imponderables of "where" an Internet company is located for purposes of state regulation.

[10] Plaintiffs contend that they could offer a valuable service to Oklahoma customers because, whereas "caskets commonly represent upwards of 25 per cent (and [in] some cases more) of the total cost of funeral-related goods and services," Dist. Ct. Op. at 3, they can sell these products at a substantial discount. We note that there is significant debate regarding whether increased competition in the casket-sales market will decrease overall funeral costs. Although the FTC prohibits funeral directors from charging a direct "casket-handling fee" to recoup revenue lost from the sale of the casket, *see* 16 C.F.R. § 453.4(b)(1)(ii), many funeral directors simply raise the overall price of nondeclinable fees for all customers—thus increasing everyone's overall funeral costs. *See, e.g., Pennsylvania Funeral Dir. Assoc., Inc. v. FTC*, 41 F.3d 81, 84-85 (3d Cir. 1994) (noting that, although some hope exists that increased competition in the casket market will eventually lower overall funeral prices, it will assuredly cause "many funeral service providers . . . [to] raise the amount of their non-declinable professional service fees in order to ensure that they recoup overhead costs."); Dist. Ct. Op. at 6 ("In some cases, however, when competition increases, funeral homes have raised their prices for the other services they provide in order to

(continued...)

these sales because they "have a reasonable and genuine fear that if they were to sell caskets to Oklahoma consumers, they might be prosecuted for violation of the FSLA and Board rules." Dist. Ct. Op. at 3.

Importantly, Plaintiffs have no desire to obtain the appropriate Oklahoma licenses because they view their requirements as irrelevant to the operation of an intrastate, Internet, retail, casket business. On this point, the District Court specifically found that

> very little specialized knowledge is required to sell caskets. Most consumers select caskets based on price and style. Any information a generally educated person needs to know about caskets in order to sell them can be acquired on the job. Less than five per cent of the education and training requirements necessary for licensure in Oklahoma pertain directly to any knowledge or skills necessary to sell caskets. As a result of the substantial mis-fit between the education and training required for licensure and the education and training required to sell caskets in Oklahoma, people who only wish to sell caskets, if they wish to make in-state sales, are required to spend years of their lives equipping themselves with knowledge and training which is not directly relevant to selling caskets. Dist. Ct. Op. at 5.

Thus, Plaintiffs brought this declaratory judgment action, asserting that the FSLA violates the Privileges and Immunities, Due Process, and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution. [11] After a

---

[10](...continued)
compensate for profits lost due to lower casket prices.").

[11] At trial, Plaintiffs also contended that the FSLA violated the "dormant" Commerce Clause. Given the District Court's factual findings, *see supra* at 4-5,

thorough bench trial, the District Court, in its well-reasoned order and memorandum, found for the Board on all counts. Plaintiffs filed a timely notice of appeal.

## II. STANDARD OF REVIEW

"We review challenges to the constitutionality of a statute de novo." *United States v. Plotts*, 347 F.3d 873, 877 (10th Cir. 2003) (quotations omitted). We review the District Court's factual findings for clear error. Fed. R. Civ. P. 52(a).

## III. PRIVILEGES AND IMMUNITIES CLAUSE

Plaintiffs contend that the FSLA violates the Privileges and Immunities Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States[.]"). Citing *Saenz v. Roe*, 526 U.S. 489 (1999), they contend that "the right to earn an honest living . . . [is found] in the Privileges and Immunities Clause." Aplt. Brief at 62. Despite Plaintiffs' protestations, *Saenz* does not mark a sea change in long-standing constitutional jurisprudence. As such, we agree with the District Court's disposition of this

---

[11](...continued)
this doctrine is inapplicable. Moreover, Plaintiffs do not reassert this claim on appeal. As such, it is waived. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

claim: "There is no merit to this ground for challenge. Revival of the Privileges and Immunities Clause may be an interesting and useful topic for scholarly debate but this memorandum is not the place for that discussion." Dist. Ct. Op. at 8 (citations omitted). To the extent that Plaintiffs argue that we should overrule the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872), it is enough to remind Plaintiffs that "it is [the Supreme] Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *but see Saenz*, 526 U.S. at 521 (Thomas, J., dissenting) (urging the Court to reconsider its privileges-and-immunities jurisprudence).

## IV. DUE PROCESS AND EQUAL PROTECTION CLAUSES

Plaintiffs next contend that the FSLA violates two rights under the Fourteenth Amendment. First, they claim, as a matter of substantive due process, that the FSLA violates "the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose[.]" *Dent v. West Virginia*, 129 U.S. 114, 121 (1889) (upholding West Virginia's physician licensing scheme against a substantive due process challenge). Second, they contend, as a matter of equal protection, that the FSLA is unconstitutional because the Board is "arbitrarily treating similarly-situated people differently, and . . . arbitrarily treating differently-situated people the same." Aplt. Brief at 24. As a state economic regulation that does not affect a fundamental right and

categorizes people on the basis of a non-suspect classification, we determine whether the FSLA passes constitutional muster, both as a matter of substantive due process and equal protection, by applying rational-basis review. *See Fitzgerald*, 539 U.S. at 107 (equal protection); *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (substantive due process).

A.    Equal Protection Versus Substantive Due Process

Because their substantive analyses converge, often the differences between equal protection and substantive due process are not fully appreciated. The Equal Protection and Due Process clauses protect distinctly different interests. On the one hand, the "substantive component" of the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), even when the challenged regulation affects all persons equally. In contrast, "the essence of the equal protection requirement is that the state treat all those similarly situated similarly," *Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1149 (10th Cir. 2001) (quotations omitted), with its "central purpose [being] the prevention of official conduct discriminating on the basis of race [or other suspect classifications,]" *Washington v. Davis*, 426 U.S. 229, 239 (1976). As such, equal protection only applies when the state treats two groups, or individuals, differently.

Here, Plaintiffs have cast their challenge to the FSLA as both a substantive due process and an equal protection claim. Although Plaintiffs forward both contentions, their challenge is most properly presented as an equal protection claim, as evidenced by the fact that they almost exclusively cite to equal protection cases (even to support their substantive due process argument) and that the Court itself has most often analyzed regulatory challenges under the equal protection rubric. In any event, because a substantive due process analysis proceeds along the same lines as an equal protection analysis, our equal protection discussion sufficiently addresses both claims.

B.    Parties' Arguments

To satisfy the rational basis test, "the [FSLA] need only be rationally related to a legitimate government purpose." *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). The Board argues that protecting casket purchasers, a particularly vulnerable group, constitutes a legitimate state interest. Plaintiffs concede this point, and we agree as well. *See Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189-90 (1997) (finding consumer protection a legitimate federal governmental interest in a First Amendment challenge). Thus, as framed by the parties, the relevant question is whether the FSLA's licensure scheme is rationally related to the state's proffered consumer protection interest.

Plaintiffs contend that it is not. They argue that the regulatory scheme is

-12-

irrational because "[ l]ess than five per cent of the education and training requirements necessary for licensure in Oklahoma pertain directly to any knowledge or skills necessary to sell caskets[.]" Dist. Ct. Op. at 5; *see also Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1111 (S.D. Cal. 1999) (holding California's cosmetology licensing requirements in violation of the Fourteenth Amendment's Due Process and Equal Protection clauses because "just over six percent of the curriculum is relevant . . . . [to] a would-be African hair braider"). Indeed, Plaintiffs claim that "every single federal court . . . that has considered casket sales restrictions like Oklahoma's has found they lack any rational basis."[12] Aplt. Brief at 23.

The Board concedes that its licensure requirements do not perfectly match its asserted consumer-protection goal. Instead, they contest the degree of fit needed to pass rational-basis review. In the Board's view, "[a] statutory classification fails rational-basis review only when it rests on grounds *wholly*

---

[12]Plaintiffs cite the following cases: *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) (holding Tennessee's casket selling licensure requirements, which are nearly identical to Oklahoma's, in violation of the Fourteenth Amendment's Due Process and Equal Protection clauses); *Craigmiles v. Giles*, 110 F. Supp. 2d 658 (E.D. Tenn. 2000) (same); *Casket Royale, Inc. v. Mississippi*, 124 F. Supp. 2d 434 (S.D. Miss. 2000) (same in relation to Mississippi's casket statute). Plaintiffs' statement pushes the bounds of credulity, however, given *Guardian Plans, Inc. v. Teague*, 870 F.2d 123 (4th Cir. 1988). In *Teague*, upon which the Board relies heavily, the Fourth Circuit rejected an equal protection and substantive due process challenge to Virginia's funeral regulatory scheme, one substantially similar to Oklahoma's.

irrelevant to the achievement of the State's objective." *Heller v. Doe by Doe*, 509 U.S. 312, 324 (1993) (quotations omitted) (emphasis added). The Board further contends that:

> [t]hese restraints on judicial review have added force where the legislature must necessarily engage in a process of line-drawing. Defining the class of persons subject to a regulatory requirement . . . inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration. . . . This necessity renders the precise coordinates of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally. *FCC v. Beach Communications, Inc*., 508 U.S. 307, 315-16 (1993) (internal citations and quotations omitted).

The Board urges that its licensing protocol is not "wholly irrelevant" because "[e]very witness who testified on the subject agreed that consumers purchasing time-of-need caskets may be especially vulnerable to overreaching sales tactics because of grief and other emotions which arise as the result of the death of the person for whom the consumer is purchasing a casket." Dist. Ct. Op. at 5. The Board further notes that "[e]ven [Plaintiffs'] own expert, Lisa Carlson, admitted that Oklahoma's FSLA functions to protect consumers and that removing those provisions would effectively reduce consumer protection for people buying caskets in . . . Oklahoma." Aple. Brief at 22.

C.    Equal Protection and Judicial Review of Economic Legislation

In *United States v. Carolene Products Co.*, 304 U.S. 144, 154 (1938), the

-14-

Court held, pursuant to rational basis review, that when legislative judgment is called into question on equal protection grounds and the issue is debatable, the decision of the legislature must be upheld if "any state of facts either known or which could reasonably be assumed affords support for it." Second-guessing by a court is not allowed. *Id*.; *see also Beach Communications*, 508 U.S. at 313 ("[E]qual protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."); *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam) ("The judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . .").

Further, rational-basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question. *Mourning v. Family Publ'n Serv., Inc*., 411 U.S. 356, 378 (1973). In fact, we will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, *Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 50 (1966), *abrogated on other grounds by Healy v. Beer Inst., Inc.*, 491 U.S. 324, 342 (1989), or because the statute's classifications lack razor-sharp precision, *Dandridge v. Williams*, 397 U.S. 471, 485 (1970). Nor can we overturn a statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice. *Vance v. Bradley*, 440 U.S. 93, 110-11 (1979).

-15-

Finally, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Communications*, 508 U.S. at 315 (citations and quotations omitted). "[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it[.]'" *Id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)); *see also McDonald v. Board of Election Comm'rs*, 394 U.S. 802, 809 (1969) ("Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them."). As such, we are not bound by the parties' arguments as to what legitimate state interests the statute seeks to further. In fact, "this Court is *obligated* to seek out other conceivable reasons for validating [a state statute.]" *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 146 (1st Cir. 2001) (emphasis added). Indeed, that the purpose the court relies on to uphold a state statute "was not the reason provided by [the state] is irrelevant to an equal protection inquiry." *Id.* (citing *Beach Communications*, 508 U.S. at

315).[13]

These admonitions are more than legal catchphrases dutifully recited each time we confront an equal protection challenge to state regulation—they make sense. First, in practical terms, we would paralyze state governments if we undertook a probing review of each of their actions, constantly asking them to "try again." Second, even if we assumed such an exalted role, it would be nothing more than substituting our view of the public good or the general welfare for that chosen by the states. As a creature of politics, the definition of the public good changes with the political winds. There simply is no constitutional or Platonic form against which we can (or could) judge the wisdom of economic regulation. Third, these admonitions ring especially true when we are reviewing the regulatory actions of states, who, in our federal system, merit great respect as separate sovereigns. *See generally Geier v. American Honda Motor, Inc.*, 529

---

[13] *See also City of Dallas v. Staglin*, 490 U.S. 19, 26 (1989); *Beatie v. City of New York,* 123 F.3d 707, 711-12 (2d Cir. 1997) ("Supreme Court jurisprudence now informs us that when reviewing challenged social legislation, a court must look for 'plausible reasons' for legislative action, whether or not such reasons underlay the legislature's action.") (citing *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)); *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 240 (8th Cir. 1994) ("[W]e are not bound by explanations of the [policy's] rationality that may be offered by litigants or other courts.") (quoting *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 463 (1988)); *Burke Mountain Acad., Inc. v. U.S.,* 715 F.2d 779, 783 (2d Cir. 1983) ("It is our job to try to divine what Congress left unstated [and] we resort to our own talents and those of counsel to discern the rationality of the classification in question.") (internal quotations omitted).

U.S. 861, 894 (2000).

Thus, we are obliged to consider every plausible legitimate state interest that might support the FSLA—not just the consumer-protection interest forwarded by the parties. Hence, we consider whether protecting the intrastate funeral home industry, absent a violation of a specific constitutional provision or a valid federal statute, constitutes a legitimate state interest. If it does, there can be little doubt that the FSLA's regulatory scheme is rationally related to that goal. *See Craigmiles v. Giles*, 312 F.3d 220, 228 (6th Cir. 2002) (stating that Tennessee's version of the FSLA is "very well tailored" to "protecting licensed funeral directors from competition on caskets").

D. <u>Intrastate Economic Protectionism</u>

Implicit in Plaintiffs' argument is the contention that intrastate economic protectionism, even without violating a specific constitutional provision or a valid federal statute, is an illegitimate state interest. *See* Aplt. Brief at 53 n.8. Indeed, Plaintiffs describe Oklahoma's licensure scheme as "a classic piece of special interest legislation designed to extract monopoly rents from consumers' pockets and funnel them into the coffers of a small but politically influential group of businesspeople—namely, Oklahoma funeral directors." *Id.* at 26. Amici are not so coy. In their view, Oklahoma's licensure scheme "is simply . . . protectionist legislation[,]" Brief of Amicus Curiae Claremont Institute at 26, and "[u]nder the

-18-

Constitution, . . . economic protectionism is not a legitimate state interest[,]"
Brief of Amicus Curiae Pacific Legal Foundation at 2.

By our count, only three courts have held, in the absence of a violation of a specific constitutional provision or a valid federal statute, that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose." *Craigmiles*, 312 F.3d at 224; [14] *see also Cornwell*, 80 F. Supp. 2d at 1117 (implying, without citation, that establishing a cartel for cosmetology services is not a legitimate state interest); *Santos v. City of Houston*, 852 F. Supp 601, 608 (S.D. Tex. 1994) (holding that "economic protectionism in its most glaring form . . . [is] not legitimate."). [15] Because the four Supreme Court cases collectively cited by *Craigmiles* and *Santos* do not stand for the proposition that intrastate economic protectionism, absent a violation of a specific constitutional provision or federal statute, is an illegitimate state interest, we cannot agree.

In fact, it is only by selective quotation that such a reading of these Supreme Court cases appears plausible. For example, in *H.P. Hood & Sons, Inc., v. DuMond*, 336 U.S. 525 (1949), the Court considered whether "the State of New

---

[14] Citing *Energy Reserve Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *H.P. Hood & Sons, Inc., v. DuMond*, 336 U.S. 525, 537-38 (1949).

[15] Citing *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 (1981).

York [had the power] to deny additional facilities to acquire and ship milk in *interstate* commerce where the grounds of denial are that such limitation upon *interstate* business will protect and advance local economic interests." *Id*. at 526 (emphasis added). The Court struck the legislation. The *Craigmiles* court cites to the following passage from *H.P. Hood & Sons*, which is clearly limited to the regulation of *interstate* commerce, to support its conclusion that *intrastate* economic protectionism is an illegitimate state interest:

> This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units. As the Court said in *Baldwin v. G.A.F. Seelig, Inc*., 294 U.S. 511, 527, 'What is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation.' In so speaking it but followed the principle that the state may not use its admitted powers to protect the health and safety of its people as a basis for suppressing competition. In *Buck v. Kuykendall*, 267 U.S. 307, the Court struck down a state act because, in the language of Mr. Justice Brandeis, 'Its primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition.' The same argument here advanced, that limitation of competition would itself contribute to safety and conservation, and therefore indirectly serve an end permissible to the state, was there declared 'not sound.' It is no better here. This Court has not only recognized this disability of the state to isolate its own economy as a basis for striking down parochial legislative policies designed to do so, but it has recognized the incapacity of the state to protect its own inhabitants from competition as a reason for sustaining particular exercises of the commerce power of Congress to reach matters in which states were so disabled. *H. P. Hood & Sons*, 336 U.S. at 537-38 (citations omitted).

When read in context, *H.P. Hood & Sons*'s admonition is plainly directed at state regulation that shelters its economy from the larger national economy, i.e., violations of the "dormant" Commerce Clause.

The other cases relied upon in *Craigmiles* and *Santos* are similarly distinguishable. *See Energy Reserve Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1983) (addressing a Contracts Clause-specific issue); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981) (addressing the "dormant" Commerce Clause); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 618 (1978) (addressing whether "[a] New Jersey law prohibit[ing] the importation of most solid or liquid waste which originated or was collected outside the territorial limits of the State . . . . violates the Commerce Clause of the United States Constitution."). As such, these passages do not support the contention espoused in *Craigmiles* and *Santos* that intrastate economic protectionism, absent a violation of a specific federal statutory or constitutional provision, represents an illegitimate state interest. Our country's constitutionally enshrined policy favoring a national marketplace is simply irrelevant as to whether a state may legitimately protect one intrastate industry as against another when the challenge to the statute is purely one of equal protection. *See Metropolitan Life Ins. Co. v. W.G. Ward*, 470 U.S. 869 (1985) (noting that the Commerce Clause and the Equal Protection Clause "perform different functions in the analysis of the permissible

-21-

scope of a state's power—one protects interstate commerce, and the other protects persons from unconstitutional discrimination by states").

In contrast, the Supreme Court has consistently held that protecting or favoring one particular intrastate industry, absent a specific federal constitutional or statutory violation, is a legitimate state interest. *See Fitzgerald*, 539 U.S. at 109 (holding that the hypothetical goal of fostering intrastate riverboat gambling provided a rational basis to support legislation taxing riverboat slot machine revenues at a more favorable rate than those from racetrack slot machines); *Ferguson*, 372 U.S. at 730-31 ("It is now settled that States have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law.") (quotations omitted); *Dukes*, 427 U.S. at 304 n.5 ( "[T]hese principles . . . govern only when no constitutional provision other than the Equal Protection Clause itself is apposite. Very different principles govern even economic regulation when constitutional provisions such as the Commerce Clause are implicated, or when local regulation is challenged under the Supremacy Clause as inconsistent with relevant federal laws or treaties.").

The Court's application of this principle is found in numerous state subsidization and licencing equal protection cases. For example, in *Fitzgerald*,

the Court held that an Iowa statute taxing slot machine revenues on riverboats at 20 %, while taxing those at racetracks at 36 %, did not violate the Equal Protection Clause because, even though they harmed the racetracks, "the different tax rates" may have furthered the state's legitimate interest in "help[ing] the riverboat industry." 539 U.S. at 110. More specifically, the *Fitzgerald* Court held:

> Once one realizes that not every provision in a law must share a single objective, one has no difficulty finding the necessary rational support for the 20 percent/36 percent [tax] differential here at issue. That difference, harmful to the racetracks, is helpful to the riverboats, which, as respondents concede, were also facing financial peril. These two characterizations are but opposite sides of the same coin. Each reflects a rational way for a legislator to view the matter. *Id.* at 109 (citations omitted).

Indeed, even Plaintiffs concede that "the [ *Fitzgerald* ] Court found [helping the riverboat industry] to be [a] legitimate governmental objective[.]" Aplt. Reply Brief at 6.

In *Nordlinger v. Hahn*, 505 U.S. 1, 18 (1992), the Court held that California's property taxation scheme, which favored long-time property holders over new purchasers, did not violate the Equal Protection Clause. In discussing the many possible reasons for the taxation scheme, the Court held that "[t]he State . . . legitimately can decide to . . . [favor] established, 'mom-and-pop' businesses . . . [over] newer chain operations." *Id*. at 12.

In *Dukes*, the Court rejected an Equal Protection Clause challenge to a New

-23-

Orleans ordinance that prohibited selling foodstuffs from pushcarts in the French Quarter, even though it exempted area vendors who had continuously operated that business for eight or more years. 427 U.S. at 298. This ordinance had the effect of allowing only two vendors to continue operation in the French Quarter. *Id*. at 300. Although the court of appeals struck the legislation as furthering an illegitimate state purpose because the ordinance created "a protected monopoly for the favored class member[,]" *id*. (quotations omitted), the Court rejected this reasoning, *id*. at 303. Instead, it found that the ordinance furthered a legitimate state purpose, because the presence of "vendors in the [French Quarter], the heart of the city's tourist industry, might . . . have a deleterious effect on the economy of the city." *Id*. at 304-05. As the Court noted, "[t]he legitimacy of that objective [, i.e., benefitting the tourist industry,] is obvious." *Id*. at 304.

Finally, in the watershed Equal Protection Clause case of *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483 (1955), the Court held that a state may set as a legitimate goal "free[ing a] profession, to as great an extent as possible, from all taints of commercialism." 348 U.S. at 491. Indeed, *Williamson* so closely mirrors the facts of this case that, but for the Siren's song that has recently induced other courts to strike state economic legislation similar to the FSLA,

-24-

merely a citation to *Williamson* would have sufficed to dispose of this case. [16]

Similarly, the Tenth Circuit has held that state legislation granting special benefits to an intrastate industry, absent a specific federal constitutional or statutory violation, does not run afoul of the Equal Protection Clause. For example, in *Schafer v. Aspen Skiing Corp*., 742 F.2d 580, 583 (10th Cir. 1984), an injured party pursued an equal protection challenge to Colorado's special three-year statute of limitations that applied only to suits against the ski industry. In rejecting the challenge, we noted that "[t]he ski industry makes a substantial contribution, directly or indirectly, to the Colorado economy" and that the "state has a legitimate interest in its well-being and economic viability." *Id*. at 584. Although the plaintiff in *Schafer* was an injured consumer and not a competitor, the underlying principle holds true: favoring one intrastate industry over another is a legitimate state interest. In short, given the overwhelming supporting authority, and the dearth of credible arguments to the contrary, we hold that, absent a violation of a specific constitutional provision or other federal law, intrastate economic protectionism constitutes a legitimate state interest.

---

[16] The Court has not limited this deferential jurisprudence to equal protection cases. In the substantive due process arena, the Court has stated "[t]he Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned." *Nebbia v. New York*, 291 U.S. 502, 527-28 (1934). Indeed, the Court stated that even the establishment of a monopoly is a legitimate state interest. *Id*. at 529.

We also note, in passing, that while baseball may be the national pastime of the citizenry, dishing out special economic benefits to certain in-state industries remains the favored pastime of state and local governments. [17] While this case does not directly challenge the ability of states to provide business-specific economic incentives, adopting a rule against the legitimacy of intrastate economic protectionism and applying it in a principled manner would have wide-ranging

_____

[17]Examples from states in this circuit abound. *See*, *e.g.*, John Greiner, *Henry to Back Tire Plant Bill*, The Oklahoman, May 26, 2004, at 1B (discussing the Oklahoma Quality Investment Act, which provides Oklahoma City's Bridgestone/Firestone tire manufacturing plant with $5 million in state financial assistance); Brice Wallace, *State Hopes to Lure Jobs*, Deseret Morning News, May 22, 2004, at D12 (noting that the Utah Board of Business and Economic Development extended financial incentives to lure new jobs to the Qwest Bilingual and National Vinyl Products facilities already located in the state); Gargi Chakrabarty, *Kodak Picks Weld; Windsor Plant Wins Competition for New Investment, 60 Jobs*, Rocky Mtn. News, Mar. 23, 2004, at 1B (noting cash incentives, state job training funds, and property tax reductions given to Eastman Kodak Co. to encourage expansion in Windsor, Colorado); Andrew Webb, *Hydrogen Plan Lands Funds*, Albuquerque J., Mar. 5, 2004, at B6 (discussing New Mexico's Advanced Technologies Economic Development Act, which aims to use economic incentives to attract hydrogen research businesses to the state); Morgan Chilson, *Boeing Sees Future in 7E7*, Topeka Cap.-J., Sept. 7, 2003 (discussing a Kansas bill that allows the state to issue $500 million in bonds to help Boeing Wichita acquire a role in manufacturing the 7E7 jetliner); Jeff Gosmano, *Wyoming Pipeline Group Seeks to Jump Start Pipeline Building Process*, Natural Gas Week, Aug. 29, 2003 (noting the legislation adopted by Wyoming giving the state the power to issue $1 billion in bonds to revive gas pipeline development). Additionally, state and local governments often craft measures to protect current businesses from additional competition. *See, e.g.,* Annys Shin & Michael Barbaro, *Council Bill Targets Wal-Mart*, WASH. POST, June 15, 2004, at E01(commenting on a proposed zoning restriction on "big box" stores that is crafted narrowly to apply almost exclusively to Wal-Mart Supercenters).

consequences. *See Vieth v. Jubelirer*, ___ U.S. ___, 124 S. Ct. 1769, 1776-77 (2004) ("[J]udicial action must be governed by standard, by rule. Laws promulgated by [legislatures] can be inconsistent, illogical, and ad hoc; law pronounced by the courts must be principled, rational, and based upon reasoned distinctions."). Thus, besides the threat to all licensed professions such as doctors, teachers, accountants, plumbers, electricians, and lawyers, *see, e.g.*, Oklahoma Statutes, title 59 (listing over fifty licensed professions), every piece of legislation in six states aiming to protect or favor one industry or business over another in the hopes of luring jobs to that state would be in danger. While the creation of such a libertarian paradise may be a worthy goal, Plaintiffs must turn to the Oklahoma electorate for its institution, not us.

E.      Oklahoma's Regulatory Scheme

Because we find that intra-state economic protectionism, absent a violation of a specific federal statutory or constitutional provision, is a legitimate state interest, we have little difficulty determining that the FSLA satisfies rational-basis review. As discussed above, *see supra* note 11, the Board enforces the FSLA in such a manner as to avoid any conflict with the "dormant" Commerce Clause. Moreover, we find no other federal statutory or constitutional provision that the FSLA violates. In particular, we note that, despite the FTC's protestations before the trial court that the FSLA does not "advanc[e] the ends of

the FTC's Funeral Rule,"[18] the FSLA does not transgress any of the Rule's express provisions. *See* 16 C.F.R. §§ 431.1-453.9. Hence, the FSLA need only be rationally related to the legitimate state interest of intrastate industry protection. There can be no serious dispute that the FSLA is "very well tailored" to protecting the intrastate funeral-home industry. *Craigmiles*, 312 F.3d at 228. As such, "our inquiry is at an end." *United States R.R. Retirement Bd. v. Fitz*, 449 U.S. 166, 179 (1980).

F.      *Craigmiles v. Giles*

In so holding, we part company with the Sixth Circuit's *Craigmiles* decision, which struck a nearly identical Tennessee statute as violating the Equal Protection Clause and substantive due process. Our disagreement can be reduced to three points.[19] First, as noted by the District Court, *Craigmiles*'s analysis focused heavily on the court's perception of the actual motives of the Tennessee legislature. *Craigmiles*, 312 F.3d at 227 ("The state could argue that the Act as a whole . . . actually provides some legitimate protection for consumers from casket

---

[18] Brief of Amici Curiae Federal Trade Commission at 1, *Powers v. Harris*, CIV-01-445-F (W.D. Okla 2002). The FTC did not appear as amicus on appeal, but it did submit an amicus brief below. The parties did not include this brief in the record on appeal. *But see* http://www.ftc.gov/os/2002/09/okamicus.pdf (last visited on July 6, 2004).

[19] We also reject *Casket Royale, Inc.*, 124 F. Supp. 2d 434 (S.D. Miss. 2000), *Santos*, 852 F. Supp 601 (S.D. Tex. 1994), and *Brown v. Barry*, 710 F. Supp. 352 (D.D.C. 1989) for these same reasons.

retailers.  The history of the legislation, however, reveals a different story . . . .").

The Supreme Court has foreclosed such an inquiry.  *Beach Communications*, 508

U.S. at 315 ("[B]ecause we never require a legislature to articulate its reasons for

enacting a statute, it is entirely irrelevant for constitutional purposes whether the

conceived reason for the challenged distinction actually motivated the

legislature.").  Second, the *Craigmiles* court held that "protecting a discrete

interest group from economic competition is not a legitimate governmental

purpose." *Craigmiles*, 312 F.3d at 224.  As discussed above, we find this

conclusion unsupportable.  *See Fitzgerald*, 539 U.S. at 109-110 (holding, after the

decision in *Craigmiles*, that the objective of favoring one intrastate industry over

another provides a rational basis to support legislation).  Third, in focusing on the

actual motivation of the state legislature and the state's proffered justifications

for the law, the *Craigmiles* court relied heavily on *Cleburne v. Cleburne Living

Center, Inc.*, 473 U.S. 432 (1985).  We find this emphasis misplaced.

A few additional words are in order regarding our last point of

disagreement.  In essence, Plaintiffs in this case "ask this court to engage in what

they assert to be an exacting rational-basis standard set forth by the Supreme

Court in *Cleburne*[.]" *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927

F.2d 1111, 1119 n.6 (10th Cir. 1991). Pursuant to their reading of *Cleburne*,[20] "a court would be shrinking from its most basic duty if it abstained from *both* an analysis of the legislation's *articulated* objective *and* the method that the legislature employed to achieve that objective." *Brown v. Barry*, 710 F. Supp. 352, 355 (D.D.C. 1989); *see also Craigmiles*, 312 F.3d at 227. This reading of *Cleburne*, however, constitutes a marked departure from "traditional" rational-basis review's prohibition on looking at the legislature's actual motives, *see Beach Communications*, 508 U.S. at 315, and our obligation to forward every conceivable legitimate state interest on behalf of the challenged statute, *see, e.g., Starlight Sugar*, 253 F.3d at 146.

Despite the hue and cry from all sides,[21] no majority of the Court has stated

---

[20]Plaintiffs push hard for a similar reading of *Romer v. Evans*, 517 U.S. 620 (1996). For purposes of this appeal, our treatment of *Cleburne* applies equally to *Romer*.

[21] Debate over whether the Court has developed a higher-order rational-basis review began not long after *Cleburne*. *See, e.g.,* Erwin Chemerinsky, *Constitutional Law: Principles and Policies*, 536 (1997) ("The claim is that in some cases where the Court says it is using rational basis review, it is actually employing a test with more 'bite' than the customarily very deferential rational basis review. . . . The claim is that there is not a singular rational basis test but one that varies between complete deference and substantial rigor."); Robert C. Farrell, *Legislative Purpose & Equal Protection's Rationality Review*, 37 Vill. L. Rev. 1, 65 (1992) (suggesting that there are two levels of rational basis review used by the Court in an unpredictable manner); Gayle Lynn Pettinga, Note, *Rational Basis with Bite: Intermediate Scrutiny by Any Other Name*, 62 Ind. L.J. 779 (1987) (claiming that the Court's use of heightened rational basis review creates confusion in lower courts and legislatures by failing to delineate when

(continued...)

that the rational-basis review found in *Cleburne* and *Romer v. Evans*, 517 U.S.

620 (1996)*, differs from the traditional variety applied above. *But see Lawrence

v. Texas*, 539 U.S. 558, ___, 123 S. Ct. 2472, 2485 (2003) (O'Connor, J.,

concurring in part) ("When a law exhibits such a desire to harm a politically

unpopular group, we have applied a more searching form of rational basis review

to strike down such laws under the Equal Protection Clause.").  Perhaps, as

Justice O'Connor suggests, *Cleburne* and *Romer* represent the embryonic stages

of a new category of equal protection review.  *See Cleburne*, 473 U.S. at 458

(Marshall, J., concurring in part and dissenting in part) (labeling *Cleburne*'s

rational-basis review "'second-order' rational-basis review").  But "[e]ven if we

were to read *Cleburne* to require that laws discriminating against historically

unpopular groups meet an exacting rational-basis standard," which we do not, "we

do not believe the class in which [Plaintiffs] assert they are a member merits such

scrutiny." *Jacobs, Visconsi & Jacobs, Co.*, 927 F.2d at 1119 n.6.

On the other hand,  *Romer*  and *Cleburne*  may not signal the birth of a new

category of equal protection review.  Perhaps, after considering all other

---

[21](...continued)
differing types of rational basis review apply).  Indeed, at least one commentator
has argued that the Court employs at least six versions of rational-basis review.
*See* R. Randall Kelso, *Standards of Review Under the Equal Protection Clause &
Related Constitutional Doctrines Protecting Individual Rights: The "Base Plus
Six" Model & Modern Supreme Court Practice*, 4 U. Pa. J. Const. L. 225, 231
(2002).

conceivable purposes, the *Romer* and *Cleburne* Courts found that "a bare . . .
desire to harm a politically unpopular group," *Department of Agriculture v.
Moreno*, 413 U.S. 528, 534 (1973), constituted the only conceivable state interest
in those cases, *see Clajon Production Corp. v. Petera*, 70 F.3d 1566, 1581 n.24
(10th Cir. 1995) (forwarding this interpretation of *Cleburne*). Under this reading,
*Cleburne* would also not apply here because we have conceived of a legitimate
state interest other than a "bare desire to harm" non-licensed, time-of-need, retail,
casket salespersons.

Finally, perhaps *Cleburne* and *Romer* are merely exceptions to traditional
rational basis review fashioned by the Court to correct perceived inequities
unique to those cases. If so, the Court has "fail[ed] to articulate [when this
exception applies, thus] provid[ing] no principled foundation for determining
when more searching inquiry is to be invoked." *Cleburne*, 473 U.S. at 460
(Marshall, J., concurring in part and dissenting in part). Regardless, the Court
itself has never applied *Cleburne*-style rational-basis review to economic issues.
*See, e.g., Fitzgerald*, 123 S. Ct. at 2159-60; *Beach Communications*, 508 U.S. at
315; *Nordlinger*, 505 U.S. at 11-13. Following the Court's lead, neither will we.
Thus, we need not decide how *Cleburne* alters, if at all, traditional rational-basis
review because, even under a modified rational basis test, the outcome here would
be unchanged.

## V. CONCLUSION

We do not doubt that the FSLA "may exact a needless, wasteful requirement in many cases.  But it is for the legislature, not the courts, to balance the advantages and disadvantages of the [FSLA's] requirement[s]."  *Williamson*, 348 U.S. at 487.  Under our system of government, Plaintiffs "'must resort to the polls, not to the courts'" for protection against the FSLA's perceived abuses.  *Id*. at 488 (quoting *Munn v. Illinois*, 94 U.S. 113, 134 (1876)).

As Winston Churchill eloquently stated: "[D]emocracy is the worst form of government except for all those other forms that have been tried."  Winston Churchill, Speech at the House of Commons (Nov. 11, 1947).  Perhaps the facts here prove this maxim.  A bill to amend the FSLA to favor persons in the Plaintiffs' situation has been introduced in the Oklahoma House three times, only to languish in committee.  *See* H.R. 1460 (Okla. 2003); H.R. 1057 (Okla. 2001); H.R. 1083 (Okla. 1999).  While these failures may lead Plaintiffs to believe that the legislature is ignoring their voices of reason, the Constitution simply does not guarantee political success.

Because we hold that intrastate economic protectionism, absent a violation of a specific federal statutory or constitutional provision, is a legitimate state interest and that the FSLA is rationally related to this legitimate end, we AFFIRM.

-33-

No. 03-6014, *Powers v. Harris*
**TYMKOVICH**, J., concurring.

I join the majority opinion except for Parts IV D and E, and concur in the judgment. I write separately because I believe the majority overstates the application of "intrastate economic protectionism" as a legitimate state interest furthered by Oklahoma's funeral licensing scheme.

The majority opinion usefully sets forth an overview of the rational basis test. Under the traditional test, judicial review is limited to determining whether the challenged state classification is rationally related to a legitimate state interest. As the majority explains, and I agree, courts should not (1) second-guess the "wisdom, fairness, or logic" of legislative choices; (2) insist on "razor-sharp" legislative classifications; or (3) inquire into legislative motivations. I also agree that the burden rests with the challenger to a legislative classification "to negative every conceivable basis" supporting the law. Courts should credit "every plausible legitimate state interest" as a part of their judicial review under this deferential standard.

Where I part company with the majority is its unconstrained view of economic protectionism as a "legitimate state interest." The majority is correct that courts have upheld regulatory schemes that favor some economic interests over others. Many state classifications subsidize or promote particular industries or discrete economic actors. And it is significant here that Oklahoma's licensing

scheme only covered intrastate sales of caskets. But all of the cases rest on a fundamental foundation: the discriminatory legislation arguably advances either the general welfare or a public interest.

The Supreme Court has consistently grounded the "legitimacy" of state interests in terms of a public interest. The Court has searched, and rooted out, even in the rational basis context, "invidious" state interests in evaluating legislative classifications. Thus, for example, in the paradigmatic case of *Williamson v. Lee Optical, Inc.*, 348 U.S. 483 (1955), the Supreme Court invoked consumer safety and health interests over a claim of pure economic parochialism. Rather than hold that a government may always favor one economic actor over another, the Court, if anything, insisted that the legislation advance some public good. *Id.* at 487-88 ("It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it. . . . The prohibition of the Equal Protection Clause goes no further than [] invidious discrimination."). Similarly, the Court in *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103 (2003) invoked economic development and protecting the reliance interests of river-boat owners, in *City of New Orleans v. Dukes*, 427 U.S. 297 (1976) invoked historical preservation and economic prosperity, and in *Nordlinger v. Hahn*, 505 U.S. 1 (1992) invoked neighborhood preservation, continuity, stability, and protecting the reliance interests of property

owners. None of these cases overturned the principle that the Equal Protection Clause prohibits invidious state interests; to the contrary, they ratified the principle.

While relying on these time-tested authorities, the majority goes well beyond them to confer legitimacy to a broad concept not argued by the Board – unvarnished economic protectionism. Contrary to the majority, however, whenever courts have upheld legislation that might otherwise appear protectionist, as shown above, courts have always found that they could also rationally advance a *non-protectionist* public good. The majority, in contrast to these precedents, effectively imports a standard that could even credit legislative classifications that advance no general state interest.

The end result of the majority's reasoning is an almost per se rule upholding intrastate protectionist legislation. I, for one, can imagine a different set of facts where the legislative classification is so lopsided in favor of personal interests at the expense of the public good, or so far removed from plausibly advancing a public interest that a rationale of "protectionism" would fail. Even those cases such as *Fitzgerald* that give some weight to economic protectionism, are careful to find a mix of state interests that advance the general welfare. No case holds that the bare preference of one economic actor while furthering no

greater public interest advances a "legitimate state interest."[1]

We need not go so far in this case for two reasons. First of all, the record below and the district court's findings of fact support a conclusion that the funeral licensing scheme here furthers, however imperfectly, an element of consumer protection. The district court found that the Board had in fact brought enforcement actions under the Act to combat consumer abuse by funeral directors. The licensing scheme thus provides a legal club to attack sharp practices by a major segment of casket retailers. Secondly, the history of the licensing scheme here shows that it predates the FCC's deregulation of third-party casket sales or internet competition, and, at least in the first instance, was not enacted solely to protect funeral directors facing increased intrastate competition. I would therefore conclude that the district court did not err in crediting the consumer protection rationale advanced by the Board.

The licensing scheme at issue here leaves much to be desired. The record makes it clear that limitations on the free market of casket sales have outlived

_____

[1] Three cases suggest that bare economic protectionism does not meet the legitimacy requirement: *Smith v. Cahoon*, 283 U.S. 553 (1931) (holding that a bonding requirement favoring agricultural interests over other industries is not legitimate); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 882 (1985) (holding that a desire to improve the local economy by fostering in-state insurance companies at the expense of out-of-state companies is not legitimate); *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336 (1989) (holding that a county tax assessment system discriminating against recent sales and protecting certain property owners is "wholly irrational").

whatever usefulness they may have had. Consumer interests appear to be harmed rather than protected by the limitation of choice and price encouraged by the licensing restrictions on intrastate casket sales. Oklahoma's general consumer protection laws appear to be a more than adequate vehicle to allow consumer redress of abusive marketing practices. But the majority is surely right that the battle over this issue must be fought in the Oklahoma legislature, the ultimate arbiter of state regulatory policy.

I therefore conclude that the legislative scheme here meets the rational basis test and join in the judgment of the majority.