# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 23, 2012

No. 11-30756

Lyle W. Cayce
Clerk

ST. JOSEPH ABBEY; MARK COUDRAIN

Plaintiffs-Appellees

v.

PAUL WES CASTILLE; BELVA M. PICHON; CRAIG G. GILL; ANDREW
HAYES; WALL V. MCKNEELY; MARGARET SHEHEE; KELLY RUSH
WILLIAMS; LOUIS CHARBORNNET, in their official capacities as Members
of the Louisiana State Board of Embalmers and Funeral Directors; PATRICK
H. SANDERS, in his official capacity in place of Oscar A. Rollins (deceased)

Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, HAYNES, and HIGGINSON, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

An Abbey of the Benedictine Order of the Catholic Church challenges as
unconstitutional rules issued by the Louisiana Board of Funeral Directors
granting funeral homes an exclusive right to sell caskets. The district court
enjoined their enforcement, finding that they deny equal protection and due
process of law.

No. 11-30756

## I.

The thirty-eight monks of St. Joseph Abbey earn their way in a pastoral setting. In years past, the Abbey's timberland provided a source of income. After Hurricane Katrina destroyed its timber, the Abbey began looking for other revenue sources. For generations the Abbey has made simple wooden caskets to bury its monks. Public interest in the Abbey's caskets increased after two bishops were buried in Abbey caskets in the 1990s. Seeing potential in this demand, the Abbey invested $200,000 in "St. Joseph Woodworks," managed by Mark Coudrain, a deacon of the Church and an employee of the Abbey. The business plan was simple. St. Joseph Woodworks offered one product – caskets in two models, "monastic" and "traditional," priced at $1,500 and $2,000 respectively, significantly lower than those offered by funeral homes. The Abbey offers no funeral services. It does not prepare a deceased for burial and its monks do not participate in funerals, except as pastors.

To be sure, Louisiana does not regulate the use of a casket, container, or other enclosure for the burial remains; has no requirements for the construction or design of caskets; and does not require that caskets be sealed. Individuals may construct their own caskets for funerals in Louisiana or purchase caskets from out-of-state suppliers via the internet. Indeed, no Louisiana law even requires a person to be buried in a casket.

Nonetheless, the Abbey's plan for casket sales faced significant regulatory burdens. The Louisiana State Board of Embalmers and Funeral Directors ("State Board") argues that, under state law, intrastate sales of caskets to the public may be made only by a state-licensed funeral director and only at a state-licensed funeral home.[1] This stricture has two layers. First, a prospective

---

[1] *See* LA. REV. STAT. §§ 37:831(37)-(39), :848.

2

No. 11-30756

casket retailer must become a licensed funeral establishment.[2]  This requires building a layout parlor for thirty people, a display room for six caskets, an arrangement room, and embalming facilities.[3]  Second, the establishment must employ a full-time funeral director.[4]  A funeral director must have a high school diploma or GED, pass thirty credit hours at an accredited college, and complete a one-time apprenticeship.[5]  The apprenticeship must consist of full-time employment and be the apprentice's "principal occupation."  None of this mandatory training relates to caskets or grief counseling.  A funeral director must also pass a test administered by the International Conference of Funeral Examining Boards.[6]  The exam does not test Louisiana law or burial practices. In Louisiana, funeral directors are the only individuals authorized by law to provide funeral services.  In sum, the State Board's sole regulation of caskets presently is to restrict their intrastate sales to funeral homes.  There are no other strictures over their quality or use.  The district court found the State's scheme to be the last of its kind in the nation.  The State Board had never succeeded in any enforcement actions against a third party seller prior to its effort to halt the Abbey's consumer sales.

## II.

Louisiana's restriction on the sales of caskets exist against the background of substantial federal regulation of the funeral industry.  Beginning in the early 1980s, the FTC promulgated regulations, known as the Funeral Rule, to mitigate

---

[2] *See id.* §§ 37:831(37), (39), :842(D).

[3] *See id.* § 37:842(D)(3).

[4] *Id.* § 37:842(D)(1).

[5] *Id.* § 37:842(A).

[6] *Id.* § § 37:842(A)(6), :831(38).

unfair or deceptive practices of funeral providers.[7]  These practices included failing to disclose price information and "bundling" of products and services. Bundling forced consumers to buy a range of funeral goods and services – whether or not they needed or wanted the whole bundle.  The FTC determined that it could not rely on state funeral licensing boards to curb such practices because the state boards were "dominated by funeral directors."[8]  The funeral directors had organized themselves into industry groups, which lobbied state legislatures and made practices such as a refusal to disclose prices part of their professional "ethics" code.  The Funeral Rule required funeral directors to provide consumers with itemized price lists and allow consumers to purchase only those goods and services they actually wanted.  A principal objective of the Funeral Rule was to "encourage entry into the funeral market of new competitors seeking to attract business by offering lower prices."[9]

After the Funeral Rule forced funeral homes to disclose casket prices, the significant mark-ups charged by the funeral homes became apparent, and a market for third-party casket sales emerged.  Funeral directors responded to this growing competition by refusing to use third-party caskets unless consumers paid large "casket-handling" fees.  The FTC responded by amending the Funeral Rule to ban casket-handling fees.[10]  In its comments on that rulemaking, the FTC explained that "casket handling fees are unfair conditions on a consumer's right to decline unwanted items he or she may wish to purchase elsewhere."[11]

---

[7] Trade Regulation Rule; Funeral Industry Practices, 47 Fed. Reg. 42260 (Sept. 24, 1982); *see* 16 C.F.R. § 453.1 *et seq.*

[8] *Id.* at 44289.

[9] *Id.* at 42293.

[10] Funeral Industry Practices Trade Regulation Rule, 59 Fed. Reg. 1592, 1593 (Jan. 11, 1994).

[11] *Id.* at 1604.

No. 11-30756

In 2008, the FTC not only decided to retain the Funeral Rule but also expressly declined to subject third-party casket vendors to the rule because, in contrast to state-licensed funeral directors, "[t]he record [was] bereft of evidence indicating significant consumer injury caused by third-party sellers."[12] Because of the FTC's interventions, Louisiana funeral homes cannot discourage consumer choice by applying casket-handling fees or by forcing consumers to purchase bundled goods and services, and Louisiana consumers can now buy caskets from third-party retailers – unless those retailers reside in Louisiana.

As the district court found, a funeral director may charge a non-declinable service fee ranging from $3,000 to $4,000 in addition to charges for individually priced goods and services.[13] This non-declinable service fee includes advice about casket selection, and the funeral director is contractually bound to assist the consumer if a problem arises. Thus, whenever a consumer retains a funeral director in Louisiana,[14] the consumer pays the funeral director thousands of dollars to provide advice on every aspect of funeral planning, including casket purchase – whether the consumer is buying a casket from the funeral home or using a homemade casket or one purchased from an out-of-state third-party retailer.

## III.

In December 2007, the State Board ordered the Abbey not to sell caskets to the public, and the next month, Boyd Mothe, Sr., the chair of the Legislative Committee for the Louisiana Funeral Directors Association and a state-licensed

---

[12] 73 Fed. Reg. 13740, 13745 (Mar. 14, 2008).

[13] *See* Regulatory Review of the Trade Regulation Rule on Funeral Industry Practices, 16 C.F.R. § 453.2(b)(4)(iii)(C).

[14] Indeed, it appears that all persons seeking to dispose of a deceased are obligated to engage a Louisiana funeral establishment. *See* La. Rev. Stat. § 37:848(D)(5).

No. 11-30756

funeral director who owns several funeral homes, initiated a formal complaint against the Abbey. By law, the nine-member State Board must consist of four licensed funeral directors, four licensed embalmers, and just one representative not affiliated with the funeral industry.[15] In 2008 and 2010, the Abbey petitioned the legislature to change the law to allow non-profit charitable groups such as the Abbey to sell caskets. Although two bills to amend the law were drafted, it appears neither made it out of committee. No member of the public opposed the bills.

Facing these hurdles, the Abbey and Deacon Mark Coudrain filed this suit in the district court under 42 U.S.C. § 1983. The Abbey and Coudrain sought declaratory and injunctive relief against enforcement of the Louisiana Embalming and Funeral Directors Act by the nine members of the State Board. These defendants are charged with the Act's enforcement under state law and are sued in their official capacity. The complaint asserted that the licensure requirements confine intrastate sales of caskets to sales by funeral directors at funeral homes, denying the Abbey and Coudrain equal protection and due process under the Fourteenth Amendment because they bear no rational relationship to any valid governmental interest. The State Board responded that the challenged rules, insulating funeral directors from competition, are rationally related to the State's legitimate interest in regulating the funeral profession. In the alternative, citing the Tenth Circuit's decision in *Powers v. Harris*,[16] the State Board maintained that economic protection of a particular industry is a legitimate state interest. After conducting a bench trial, the district court issued judgment for the Abbey, reaffirming its earlier finding that this brand of economic protectionism is not a legitimate state interest and

---

[15] *Id.* § 37:832(A)(2), (B)(1), (B)(d)(2).

[16] 379 F.3d 1208 (10th Cir. 2004).

6

No. 11-30756

finding no rational relationship between the challenged law and Louisiana's interests in consumer protection, public health, and public safety.

## IV.

The State timely appealed.  We review the district court's findings of fact for clear error and its conclusions of law de novo.[17]  After examining the record, we have doubts about the constitutionality of the State Board's regulation of intrastate casket sales.

## A.

The State Board maintains that the regulation of intrastate casket sales enjoys the deference due classic economic regulation.  Alternatively, the State Board contends that it is a rational draw upon the State's police powers in protection of consumers and public health.  The Abbey responds that no rational basis can or has been articulated that it has not negated.

Chief Justice Stone's footnote 4 in *Carolene Products*, etched in the brains of several generations of law students, both described and prescribed a fundamental dichotomy of judicial review; it retreated from the aggressive review of state regulation of business in the *Lochner* period while proceeding in the opposite direction in matters of personal liberty.[18]  Justice Douglas's opinion in *Williamson v. Lee Optical*[19] is generally seen as a zenith of this judicial deference to state economic regulation and the State Board invokes its protections, including its willingness to accept post hoc hypotheses for economic regulation.  But even *Williamson* offers the State Board little succor.  In

---

[17] *See One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011).

[18] 304 U.S. 144, 152 n. 4 (1938).

[19] 348 U.S. 483 (1955).

*Williamson*, the Oklahoma legislature forbade opticians to fit or replace eyeglass lenses in frames without a lens prescription from an ophthalmologist or optometrist, even when the replaced lens could easily be duplicated by an optician.[20]  Despite the coloration of wealth transfer to ophthalmologists and optometrists, the Court accepted the suggestion that the legislature might have concluded that some persons would benefit from seeing a doctor when replacing a lens and refused to strike down the legislation, in turn rejecting the opticians' due process and equal protection claims.  It placed emphasis on the "evil at hand for correction" to which the law was aimed, concluding that the measure was a rational, if not "in every respect logically consistent," means of addressing the perceived ill.[21]  The Supreme Court took the same approach in *City of New Orleans v. Dukes*.[22]  It upheld a New Orleans ordinance that permitted only pushcart food vendors with eight or more years of experience in the French Quarter to continue to operate in the neighborhood.  It reasoned that reducing the number of pushcart vendors, and limiting their ranks to those most likely to have the deepest ties to the area, advanced the City's legitimate objective of maintaining the French Quarter's historic character and tourist appeal.[23]

As a threshold argument, the State Board urges that pure economic protection of a discrete industry is an exercise of a valid state interest.  It points to the Tenth Circuit's decision in *Powers v. Harris*, a case in which two members of the panel said as much in turning back an attack on an Oklahoma scheme

---

[20] *Id.* at 485.  The law was also challenged for exempting sellers of ready-to-wear glasses from the prescription requirement, barring advertising of lenses and frames, and prohibiting retailers from sharing commercial space with certain eye care professionals.  *Id.* at 488-89.

[21] *Id.* at 487-88.

[22] 427 U.S. 297 (1976).

[23] *Id.*

similar to Louisiana's.[24]  Judge Tymkovitch, the third member of the panel, refused to join the majority opinion's broad approbation of "economic protectionism" as a valid governmental interest.[25]  Rather, he concurred in the judgment, persuaded that the State had otherwise identified a sufficient public purpose.[26]  The Abbey in turn points to *Craigmiles v. Giles*, in which the Sixth Circuit rejected "economic protectionism" as a rational basis for similar casket regulations, striking down those regulations as a denial of due process and equal protection.[27]

These two courts gave differing answers to the question of whether the legislation before them, both statutory schemes quite similar to that now before us, drew upon a legitimate state interest.  *Craigmiles* found  that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose."[28]  The *Powers* court saw the statutory scheme before it as logrolling by the Oklahoma legislature, its standard fare, and in its mind simple economic protectionism was a permissible basis for regulation.  In turn, it rejected the challenge to the regulations that limited the sale of caskets to funeral directors.[29]

The *Powers* court claimed that only three courts have held that "'protecting a discrete interest group from economic competition is not a legitimate governmental purpose,'"[30] and criticized those courts' holdings as having no

---

[24] 379 F.3d 1208 (10th Cir. 2004).

[25] *Id.* at 1225-27 (Tymkovitch, J., concurring).

[26] *Id.*

[27] 312 F.3d 220 (6th Cir. 2002).

[28] *Id.* at 224.

[29] *Powers*, 379 F.3d at 1225.

[30] *Id.* at 1218 (quoting *Craigmiles,* 312 F.3d at 224).

direct support in Supreme Court precedents. It then stated: "In contrast, the Supreme Court has consistently held that protecting or favoring one particular intrastate industry, absent a specific federal constitutional or statutory violation, is a legitimate state interest."[31] However, none of the Supreme Court cases *Powers* cites stands for that proposition. Rather, the cases indicate that protecting or favoring a particular intrastate industry is not an *illegitimate* interest when protection of the industry can be linked to advancement of the public interest or general welfare. *Craigmiles* and *Powers* rest on their different implicit answers to the question of whether the state legislation was supportable by rational basis. *Craigmiles* looked for rationality and found none. *Powers* found economic protection to be a traditional wielding of state power and rational by definition.

As we see it, neither precedent nor broader principles suggest that mere economic protection of a pet industry is a legitimate governmental purpose,[32] but economic protection, that is favortism, may well be supported by a post hoc perceived rationale as in *Williamson* – without which it is aptly described as a naked transfer of wealth.[33] Recently, we upheld against similar challenge a Houston taxi cab permitting scheme that disfavored small cab companies.[34] Notably, we approved of the *Craigmiles* court's reasoning, as it "confirm[ed] that

---

[31] *Id.* at 1220.

[32] *See, e.g., Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008) ("We conclude that mere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classification survives rational basis review. . . . [E]conomic protectionism for its own sake, regardless of its relation to the common good, cannot be said to be in furtherance of a legitimate governmental interest.").

[33] *See* Cass R. Sunstein, *Naked Preferences and the Constitution*, 84 COLUM. L. REV. 1689 (1984).

[34] *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, (5th Cir. 2011).

No. 11-30756

naked economic preferences are impermissible to the extent that they harm consumers."[35]  However, we found that even if Houston had been "motivated in part by economic protectionism, there is no real dispute that promoting full-service taxi operations is a legitimate government purpose under the rational basis test."[36]  We thus sustained the City's measure.  It follows that the State Board cannot escape the pivotal inquiry of whether there is such a rational basis, one that can now be articulated and is not plainly refuted by the Abbey on the record compiled by the district court at trial.  We turn then to the State Board's alternative argument – that the challenged restrictions are rationally related to protection of public health, safety, and consumer welfare, beginning with some settled guiding principles.

## B.

As the Abbey points out, although rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality.[37]  And of course, as we earlier observed, *Williamson* insists upon a rational basis, which it found.  Mindful that a hypothetical rationale, even post hoc, cannot be fantasy, and that the State Board's chosen means must rationally relate to the state interests it articulates, we turn to the State Board's proffered rational bases for the challenged law.  Our analysis does not proceed with abstraction for hypothesized ends and means do not include post hoc hypothesized facts.  Thus, we will examine the State Board's rationale informed by the setting and history of the challenged rule.

---

[35] *Id.* at 240.

[36] *Id.*

[37] *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993).

No. 11-30756

1. *Consumer Protection*

The State Board argues that the challenged law is rationally related to consumer protection because it restricts predatory sales practices by third-party sellers and protects consumers from purchasing a casket that is not suitable for the given burial space. Of course, this is a perfectly rational statement of hypothesized footings for the challenged law. But we question whether it is betrayed by the undisputed facts as pretextual.

For one, the State Board's argument obscures the actual structure of the challenged law. No provision mandates licensure requirements for casket retailers or insists that a casket retailer employ someone trained in the business of funeral direction. Rather, the licensure requirements and other restrictions imposed on prospective casket retailers create funeral industry control over intrastate casket sales. The scheme is built on the statute's interlocking definitions of "funeral establishment" and "funeral directing":

> **"Funeral establishment"** means any place or premises duly licensed by the board and devoted to or used in the care and preparation for burial of the body of a deceased person or maintained or held out to the public by advertising or otherwise as *the office or place for the practice of funeral directing*.[38]

> **"Funeral directing"** means the operation of a funeral home, or, by way of illustration and not limitation, any service whatsoever connected with the management of funerals, or the supervision of hearses or funeral cars, the purchase of caskets or other funeral merchandise, and *retail sale and display thereof,* the cleaning or dressing of dead human bodies for burial, and the performance or supervision of any service or act connected with the management of funerals from time of death until the body or bodies are delivered to the cemetery, crematory, or other agent for the purpose of disposition.[39]

---

[38] LA. REV. STAT. § 37:831(39) (emphasis added).

[39] *Id.* § 37:831(37) (emphasis added).

In other words, because a funeral establishment includes any "office or place for the practice of funeral directing," and "funeral directing" includes "the purchase of caskets or other funeral merchandise and the retail and display thereof," a casket retailer must comply with all the statutory requirements for funeral directors and funeral establishments. No rule addresses casket retailers or imposes requirements for the sale of caskets beyond confining intrastate sales to funeral homes. But, it is urged, this exclusivity will assure purchasers of caskets informed counsel.

The district court found that the extensive training the law requires of budding funeral directors does not include instruction on caskets, or how to counsel grieving customers. Given that Louisiana does not require a person to be buried in a casket, restrict casket purchases in any way by Louisianans over the internet or from other sources out of state, nor imposes requirements on any intrastate seller of caskets directly to consumers, including funeral directors, regarding casket size, design, material, or price, whatever special expertise a funeral director may have in casket selection is irrelevant to it being the sole seller of caskets. This is because customers pay funeral directors a non-declinable service fee, which contractually binds a funeral director to assist the customer with funeral and burial logistics, including, for example, casket selection, even if the customer does not purchase the casket from the funeral director. As a consequence, the customer should receive the benefit of the funeral director's experience in matters of casket selection, including complexities that arise from burial conditions in any given area. Indeed the FTC has found that "[b]y allowing a basic services fee, the Rule ensures that consumers get the benefit of choosing goods and services among a variety of options – including the option to purchase goods from the funeral provider's

competitors . . . ."[40]  A customer of a funeral home receives the same service whether or not he purchases the casket from the funeral home, and because only funeral homes can sell funeral services, and all disposing of dead bodies must be "through a funeral establishment," he must engage their service.[41]

Moreover, like the district court and consistent with its findings, we find it doubtful that the challenged law is rationally related to policing deceptive sales tactics.  In declining to expand the Funeral Rule's scope to cover third-party sellers of caskets and urns, the FTC found "there is insufficient evidence that . . . third-party sellers of funeral goods are engaged in widespread unfair or deceptive acts or practices."[42]  In fact, the Commission found the record "bereft of evidence indicating significant consumer injury caused by third-party sellers"[43] and recognized that third-party sellers do not have the same incentive as funeral home sellers to engage in deceptive sales tactics.[44]

But, even if independent third-party sellers pose a risk of engaging in deceptive sales practices, and assuming arguendo that the state legislature could so conclude, there is a disconnect between restricting casket sales to funeral homes and preventing consumer fraud and abuse.  Putting aside the fact that funeral homes, not independent sellers, have been the problem for consumers with their bundling of product and 400% markups of caskets, Louisiana's Unfair Trade Practices and Consumer Protection Law already polices inappropriate sales tactics by all sellers of caskets.  Louisiana's Unfair Trade Practices and

---

[40] 73 Fed. Reg. at 13747.

[41] *See* LA. REV. STAT. § 37:848(D)(5).

[42] 73 Fed. Reg. at 13742.

[43] *Id.* at 13745.

[44] *Id.* ("Indeed, third-party retailers have a strong economic incentive to display their prices to the public at large because offering a lower price is the primary way they compete against funeral providers for sales of funeral goods, such as caskets.").

No. 11-30756

Consumer Protection Law declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful" and empowers the state attorney general to make "rules and regulations" to interpret the provisions of the Chapter.[45]  Under the section of Louisiana's administrative code implementing the law, the state attorney general is authorized to regulate unfair trade practices in casket sales, whether or not those sales are made by state-licensed funeral homes, but must do so consistent with rules promulgated by the FTC and court decisions interpreting those rules.[46]  In short, Louisiana's consumer protection regime reaches the sales practices of all intrastate sellers of caskets and can strike at any unfair practices but interestingly only in a way complementary and consistent with the Federal Trade Commission Act.

To be clear, the FTC's Funeral Rule has not preempted Louisiana from making its own independent assessment of consumer abuse by third-party intrastate sellers.  But, were the attorney general to promulgate a rule that, as the State Board's enforcement action here aims to do, shut out third-party sellers, implementing Louisiana's ability to create a consumer protection scheme

---

[45] LA. REV. STAT. § 51:1405.

[46] *See* LA. ADMIN. CODE 16, § 501 (2012).  Section 501  provides:
These rules and regulations shall be consistent with Section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C. 45(a)(1)], as from time to time amended, any rule or regulation promulgated thereunder, and any finally adjudicated court decision interpreting the provisions of said act, rules, and regulations. This consistency shall be, therefore, the same as the Federal Trade Commission's responsibility over both:

1. anti-trust or other restraint of trade types of activities; and

2. unfair or deceptive types of activities relating to trade and commerce as it affects consumer and business interests.

Section 5(a)(1) of the Federal Trade Commission Act is the provision under which the FTC enacted the Funeral Rule, and under which it declined to extend the Funeral Rule to third-party sellers of caskets and urns.  *See* 73 Fed. Reg. at 13742 & nn. 1-2, 13745.

15

No. 11-30756

would be in tension with the rules of the FTC – rules that compel funeral homes both to accept caskets purchased from others and to not charge fees for doing so. Nor would such a rule square with FTC findings or rulemaking resting on the conclusion that third-party sellers do not engage in consumer abuse. This matrix of Louisiana law, while not dispositive of our inquiry, sheds much light on the disconnect between the post hoc hypothesis of consumer protection and the grant of an exclusive right of sale to funeral homes. That grant of an exclusive right of sale adds nothing to protect consumers and puts them at a greater risk of abuse including exploitative prices.

2. *Public Health and Safety*

Relatedly, we doubt that a rational relationship exists between public health and safety and restricting intrastate casket sales to funeral directors. Rather, this purported rationale for the challenged law elides the realties of Louisiana's regulation of caskets and burials and causes us to doubt its rationality. That Louisiana does not even require a casket for burial, does not impose requirements for their construction or design, does not require a casket to be sealed before burial, and does not require funeral directors to have any special expertise in caskets makes us doubt that a relationship exists between public health and safety and limiting intrastate sales of caskets to funeral establishments.[47]

# V.

The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption

---

[47] *Cf. Merrifield v. Lockyer*, 547 F.3d 978, 989 (9th Cir. 2008) ("[T]he singling out of a particular economic group, with no rational or logical reason for doing so, was strong evidence of an economic animus with no relation to public health, morals or safety.").

No. 11-30756

nor does it require courts to accept nonsensical explanations for naked transfers of wealth. We insist that Louisiana's rules not be irrational – the outer-most limits of due process and equal protection – as Justice Harlan put it, the inquiry is whether "[the] measure bears a rational relation to a constitutionally permissible objective."[48] Answering that question is well within Article III's confines of judicial review. That said, we should not undertake to strike down a law when doing so can be avoided by resolution of uncertainty in the state statutory scheme. Under well-settled precedent, this Court must avoid deciding a constitutional issue "if there is also present some other ground upon which the case may be disposed of."[49]

It is not within our province to here decide state law. But in the discharge of our duty to avoid constitutional decisions we are to inquire if state law can reasonably be read to offer a state law footing for our judgment. As we read it, such a state law ground may well exist. Specifically, to our eyes it is unclear whether, under Louisiana law, the State Board has authority to regulate casket sales in and of themselves when such sales are not incidental to the seller's provision of any other funeral services.[50] Such a concern is rooted in the common understanding that "[a]n administrative board or agency only has the power and

---

[48] *Ferguson v. Skrupa*, 372 U.S. 726, 733 (1963) (Harlan, J., concurring).

[49] *Ashwander v. Tennessee Valley Authority*, 297 U.S. 298, 347 (1936) (Brandeis, J., concurring), reh'g denied 297 U.S. 728 (1936). *See also County Court of Ulster County v. Allen*, 422 U.S. 140, 154 (1979) ("Federal courts are courts of limited jurisdiction. They have the authority to adjudicate specific controversies between adverse litigants over which and over whom they have jurisdiction. In the exercise of that authority, they have a duty to decide constitutional questions when necessary to dispose of the litigation before them. But they have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration."); *Burton v. United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.").

[50] Our uncertainty is heightened by prior findings that the State Board had exceeded its statutory authority. *See, e.g.,* La. Atty. Gen. Op. No. 09-0151, 2009 WL 3641003 (July 29, 2009); La. Atty. Gen. Op. No. 02-0170, 2002 WL 1483928 (June 20, 2002).

17

authority granted by the constitution or statutes"[51] and in the Louisiana Attorney General's insistence that the State Board's claimed authority be located in specifically stated grants of power.[52] One could interpret Title 37 Chapter 10, the portion of the Louisiana code creating the State Board, as only vesting the State Board with authority to regulate casket sales when made by someone who operates a funeral establishment or provides funeral services.

We see support for this reading of the State Board's authority in the language and structure of Chapter 10. Although Chapter 10 unquestionably gives the State Board power to regulate funeral directors and funeral establishments, the circularity in the structure adopted to regulate intrastate sales of caskets – requiring intrastate sellers of caskets to be licensed as funeral homes to bring their business within the State Board's regulatory reach – suggests an unspoken awareness that the State Board only has authority to regulate funeral establishments and funeral directors. In addition, the language of Chapter 10 suggests that it may only vest the State Board with authority to regulate casket sales by funeral establishments and funeral directors. For example, the 2008 amendment to the statute's pre-need provision defined "pre-need funeral contract" primarily by reference to the selling entity, as opposed to its activities, arguably indicating that the State Board has authority over specific entities – funeral homes and funeral directors – not discrete activities like the sale of caskets.[53] Under this interpretation of the statute, the State Board would only have authority to regulate the sale of caskets when made by someone who operates a funeral establishment or provides funeral services.

---

[51] *Realty Mart, Inc. v. Louisiana Board of Tax*, 336 So.2d 52, 54 (La. Ct. App. 1976).

[52] *See, e.g.,* La. Atty. Gen. Op. No. 09-0151, 2009 WL 3641003 (July 29, 2009).

[53] LA. REV. STAT. § 37:831(63).

No. 11-30756

This limitation gains more persuasive possibility when related statutory provisions are considered. The State Board regulates the business of funeral directing, and specifically here, Section 848 ("Unlawful practice"), states "[n]o person, not certified and registered under the provisions of this Chapter, shall . . . conduct the business of funeral directing . . . ."[54] That prohibition, in turn, raises the question of whether the monks, as carpenters making and then selling caskets, are conducting the business of funeral directing. To answer that question, we read Term 37 of Section 831 that explains that "'[f]uneral directing' means the operation of a funeral home . . . ."[55] This, the monks may not be doing, nor want to. As "illustration and not limitation," Term 37 clarifies that operating a funeral home encompasses: "any service whatsoever connected with the management of funerals,"[56]—not what the monks want to do; "any service whatsoever connected with . . . the supervision of hearses or funeral cars,"[57]—still not; "any service whatsoever connected with . . . the purchase of caskets or other funeral merchandise,"[58]—still not, but telling, because the broad interpretation of State Board authority, suggested by the State Board, would give it not just a monopoly on selling but also on buying, which cannot be correct; and "any service whatsoever connected with . . . the retail sale and display thereof . . . ."[59] This is it, but not exactly. The monks do not offer a funeral home "*service . . . connected with . . .* retail sale and display . . . ."[60] Indeed, with the

---

[54] LA. REV. STAT. § 37:848(A).

[55] *Id.* § 37:831(37).

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.* (emphasis added).

19

statute's phraseology in mind, Term 37 defines funeral directing as "the operation of a funeral home," and then, only by illustration, lists supervisory and management examples, plus "any service . . . connected" with such operations. This regulatory scope limitation is congruent with the acknowledgment that State Board enforcement has never been completed against in-state retailers for selling only, as distinct from in-state entities that offer funeral home services. In fact, the remainder of Term 37 then lists services that unquestionably, like "hearses," are part of the "operation of a funeral home," such as "cleaning and dressing of dead human bodies . . . ."[61] From this standpoint, we perceive again that the statute may not extend State Board authority to casket sales unconnected to funeral services. The monks, as carpenters, would not be regulated, nor would they, as vendors of their wares, doing nothing that equates to operating a funeral home.

Moreover, in reading the statutory grant of authority, it would not be surprising that the Louisiana legislature was cautious in granting regulatory power to an agency tasked with self-regulation of its industry. Thus, our uncertainty is further fueled by the reality that the legislature, in crafting the statutory grant of authority in conformity with state law strictures imposed upon delegation of legislative power,[62] may have confined the authority of the State Board to authority over its own industry – including funeral establishments, funeral directors, and embalmers – instead of granting it broad

---

[61] *See id.*

[62] *See State v. Alfonso*, 753 So.2d 156, 161 (La. 1999) ("Guided by the principles set forth in *Schwegmann* and inherent in the constitutional separation of powers, this court has fashioned a three-prong test for determining, on a case-by-case basis, whether a statute unconstitutionally delegates legislative authority, as opposed to administrative or ministerial authority, to an administrative agency. Under this test, a delegation of authority to an administrative agency is constitutionally valid if the enabling statute (1) contains a clear expression of legislative policy; (2) prescribes sufficient standards to guide the agency in the execution of that policy; and (3) is accompanied by adequate procedural safeguards to protect against abuse of discretion by the agency.").

powers to reach into other markets and regulate industry competition. In short, we question whether the State Board's regulatory power extends beyond authority to regulate the operations of certain actors – funeral establishments and funeral directors. Because a ruling on the constitutionality of the challenged regulation could be avoided by interpretation of Louisiana law, we must give due consideration to this non-constitutional ground for decision.

Resolution of the statutory uncertainty surrounding the State Board's authority must come at the hand of the Louisiana Supreme Court, whose determination of state law is supreme. When constitutional avoidance requires interpretation of a state statute, federalism concerns mandate "that state courts provide the authoritative adjudication of questions of state law" and thus "a federal court should await a definitive construction by a state court."[63] Therefore, we conclude that this appeal presents a critical issue of Louisiana law which is appropriate for resolution by certification to the Supreme Court of Louisiana and, in the interest of federalism and constitutional avoidance, defer final decision in this matter to allow the Louisiana Supreme Court to rule on the statutory uncertainty.

The parties have not requested certification, but pursuant to Rule 12 of the Rules of the Louisiana Supreme Court, this Court may certify upon its own motion.[64] And, because the doctrine of constitutional avoidance is rooted in basic

---

[63] *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 508 (1985) (O'Connor, J., concurring) ("Although federal courts generally have a duty to adjudicate federal questions properly before them, this Court has long recognized that concerns for comity and federalism may require federal courts to abstain from deciding federal constitutional issues that are entwined with the interpretation of state law . . . . The doctrine of abstention acknowledges that federal courts should avoid the unnecessary resolution of federal constitutional issues and that state courts provide the authoritative adjudication of questions of state law. Attention to the policies underlying abstention makes clear that in the circumstances of these cases, a federal court should await a definitive construction by a state court rather than precipitously indulging a facial challenge to the constitutional validity of a state statute.").

[64] SUP. CT. OF LA. R. XII.

No. 11-30756

considerations of federalism, the Abbey's failure to raise the statutory issue does not preclude us if doing so will avoid the constitutional issue.[65]

## VI.

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF THE STATE OF LOUISIANA, PURSUANT TO LA. REV. STAT. § 13:72.1 AND RULE 12 OF THE RULES OF THE LOUISIANA SUPREME COURT

It appears to the United States Court of Appeals for the Fifth Circuit that the above-styled case in this Court involves a question or proposition of the law of the State of Louisiana, which will be determinative of all state law issues in this cause,[66] which is beyond the province of this Court to resolve, and for which there appears to be no clear, controlling precedent in the decisions of the Supreme Court of Louisiana. Should the Louisiana Supreme Court accept the certification and find a lack of authority its ruling will resolve the case in its entirety. Should it reach a contrary conclusion, this Court will no longer stay its

---

[65] *See, e.g., Neese v. Southern Railway Co.*, 350 U.S. 77, 78 (1955) (per curiam) ("[I]n reversing on the above ground we follow the traditional practice of this Court of refusing to decide constitutional questions when the record discloses other grounds of decision, whether or not they have been properly raised before us by the parties."); *Alma Motor Co. v. Timken-Detroit Axle Co.*, 329 U.S. 129, 132 (1946) ("We find now, however, that the Circuit Court of Appeals had before it, not only the constitutional question, which was decided, but also a nonconstitutional question, which might properly have alone served as an adequate ground on which to dispose of the appeal. This non-constitutional question was neither considered nor decided by the court below, nor argued here. We have concluded, therefore, that we should not pass on the constitutional question at this time, but should vacate the judgment of the Circuit Court of Appeals, and remand the case to it for decision of any non-constitutional issues material to the appeal.").

[66] *See Murray v. Ramada Inn, Inc.*, 821 F.2d 272 (5th Cir. 1987), certification accepted 514 So.2d 21 (La. 1987) (accepting certification in a case in which the panel was left to determine whether the damage award below was excessive after the Supreme Court of Louisiana answered the certified question regarding assumption of risk).

No. 11-30756

hand but will promptly proceed to judgment. This Court certifies the following question of law to the Supreme Court of Louisiana for rendition of a judgment or opinion concerning such question of Louisiana law, such case being on appeal to this Court from the United States District Court for the Eastern District of Louisiana.

## STYLE OF THE CASE

The style of the case in which this certification is made is St. Joseph Abbey; Mark Coudrain, Plaintiffs-Appellees versus Paul Wes Castille; Belva M. Pichon; Craig G. Gill; Andrew Hayes; Wall V. McKneely; Margaret Shehee; Kelly Rush Williams; Louis Charbornnet, in their official capacities as Members of the Louisiana State Board of Embalmers and Funeral Directors; Patrick H. Sanders, in his official capacity in place of Oscar A. Rollins (deceased), Defendants-Appellants, case no. 11-30176, United States Court of Appeals for the Fifth Circuit, on appeal from the United States District Court for the Eastern District of Louisiana.

## STATEMENT OF THE FACTS

A complete statement of the facts in this case, the nature of the cause, and the circumstances out of which the questions or propositions of law arise is set forth in full above and will not be repeated in this certification.

## QUESTION FOR THE SUPREME COURT OF LOUISIANA

For the above stated reasons, we hereby certify the following determinative question of Louisiana law to the Supreme Court of Louisiana: Whether Louisiana law furnishes the Louisiana State Board of Embalmers and Funeral Directors with authority to regulate casket sales when made by a retailer who does not provide any other funeral services.

No. 11-30756

HAYNES, Circuit Judge, specially concurring:

I fully concur in the judgment of the court certifying the question to the Louisiana Supreme Court and in Sections I–III, V, and VI of the opinion. I conclude that it is unnecessary to discuss the issues in Section IV of the opinion at this point other than to note that there are substantial federal constitutional questions presented which might be obviated depending upon the Louisiana Supreme Court's answer to our question. I agree with my colleagues that concerns of federalism and state sovereignty strongly support certifying the question.