**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 26, 2022**

# In the Court of Appeals of Georgia

A22A0804. CARTERSVILLE MEDICAL CENTER, LLC d/b/a CARTERSVILLE MEDICAL CENTER v. FLOYD HEALTHCARE MANAGEMENT, INC. d/b/a FLOYD MEDICAL CENTER.

A22A0805. GEORGIA DEPARTMENT OF COMMUNITY HEALTH v. FLOYD HEALTHCARE MANAGEMENT, INC. d/b/a FLOYD MEDICAL CENTER

MERCIER, Judge.

In these companion appeals, Cartersville Medical Center, LLC d/b/a Cartersville Medical Center ("CMC") and the Georgia Department of Community Health (the "Department") appeal from a superior court order overturning the Department's decision to award CMC a certificate of need ("CON") for a new neonatal intermediate care service ("Level II NICU"). For reasons that follow, we reverse.

The CON program "establishes a comprehensive system of planning for the orderly development of adequate health care services throughout the state." *Doctors Hosp. of Augusta v. Dept. of Community Health*, 356 Ga. App. 428, 429 (847 SE2d 614) (2020) (citation and punctuation omitted). Pursuant to OCGA § 31-6-40 (a), "any new institutional health service shall be required to obtain a certificate of need." A party seeking a CON must submit an application to the Department, which conducts an initial review to determine whether the proposed project "is consistent with the applicable considerations" set forth in the statutory and regulatory scheme governing certificates of need. See OCGA § 31-6-43 (g); see also OCGA § 31-6-21 (b) (4) (authorizing the Department "[t]o adopt, promulgate, and implement rules and regulations sufficient to administer" the CON program); OCGA § 31-6-42 (setting forth considerations for the grant or denial of a CON). Following this review, the Department "provide[s] written notification to an applicant of the [D]epartment's decision to issue or to deny issuance of a certificate of need for the proposed project." OCGA § 31-6-43 (i).

A party dissatisfied with the initial decision may request an administrative appeal hearing before a hearing officer appointed by the Certificate of Need Appeal Panel. See OCGA § 31-6-44. The hearing officer conducts a full evidentiary hearing,

reviews the Department's initial ruling de novo, and issues written findings of fact and conclusions of law. See OCGA § 31-6-44 (e), (f), (i). A party wishing to challenge the hearing officer's decision may appeal to the commissioner of the Department. See OCGA § 31-6-44 (i). The commissioner's scope of review is defined in OCGA § 31-6-44 (k) (1):

> In the event an appeal of the hearing officer's decision is filed, the commissioner may adopt the hearing officer's order as the final order of the [D]epartment or the commissioner may reject or modify the conclusions of law over which the [D]epartment has substantive jurisdiction and the interpretation of administrative rules over which it has substantive jurisdiction. By rejecting or modifying such conclusion of law or interpretation of administrative rule, the [D]epartment must state with particularity its reasons for rejecting or modifying such conclusion of law or interpretation of administrative rule and must make a finding that its substituted conclusion of law or interpretation of administrative rule is as or more reasonable than that which was rejected or modified. Rejection or modification of conclusions of law may not form the basis for rejection or modification of findings of fact. The commissioner may not reject or modify the findings of fact unless the commissioner first determines from a review of the entire record, and states with particularity in the order, that the findings of fact were not based upon any competent substantial evidence or that the proceedings on which the findings were based did not comply with the essential requirements of law.

3

If no party appeals to the commissioner, the hearing officer's ruling becomes the Department's final agency decision. See OCGA § 31-6-44 (j). Otherwise, the decision issued by the commissioner is the final decision. See OCGA § 31-6-44 (m). Judicial review of the final decision may be pursued in superior court. See OCGA § 31-6-44.1 (a). The superior court's authority, however, is limited. The court may not reverse or modify the Department's final decision unless

> substantial rights of the appellant have been prejudiced because the procedures followed by the [D]epartment, the hearing officer, or the commissioner or the administrative findings, inferences, and conclusions contained in the final decision are: (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority of the [D]epartment; (3) Made upon unlawful procedures; (4) Affected by other error of law; (5) Not supported by substantial evidence, which shall mean that the record does not contain such relevant evidence as a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions, which such evidentiary standard shall be in excess of the "any evidence" standard contained in other statutory provisions; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Id. On further appeal to this court, "we apply the same standards of judicial review when considering the superior court's decision." *ASMC, LLC v. Northside Hosp.*, 344 Ga. App. 576, 581 (810 SE2d 663) (2018).

4

With these principles in mind, we turn to the merits of both appeals. The record shows that CMC is a 119-bed community hospital located in Cartersville, Bartow County, Georgia. It is the only hospital in the county. Among other services, CMC offers Level I basic perinatal care, with an obstetrics unit that includes seven labor and delivery rooms and ten postpartum rooms.[1] The obstetrics unit does not have a Level II NICU for infants requiring more advanced care. In fact, Bartow County is the largest county by population in Georgia that has a Level I OB program but does not offer Level II NICU services. Infants needing neonatal intermediate care following delivery at CMC must be transferred out of Bartow County to a hospital with a Level II NICU.[2]

---

[1] "'Basic Perinatal Services (Level I)' means providing basic inpatient care for pregnant women and newborns without complications; managing perinatal emergencies; consulting with and referring to specialty and subspecialty hospitals; identifying high-risk pregnancies; providing follow-up care for new mothers and infants; and providing public/community education on perinatal health." Ga. Comp. R. & Regs. r. 111-2-2-.24 (2) (a).

[2] There are four levels of neonatal care, beginning with Level I (well newborn nursery) and extending through Level IV (regional neonatal intensive care unit). Level II provides services beyond basic nursery care, including services for infants that are moderately ill, require mechanical ventilation for a brief period, or need to be stabilized following a premature birth before transfer to a neonatal intensive care unit. Recommended Guidelines for Perinatal Care in Georgia, at 44-45 (available at https://dph.georgia.gov/document/document/recommendedguidelinessectiontwo51 613revisedpdf/download); See also Ga. Comp. R. & Regs. r. 111-2-2-.24 (2) (d)

5

In November 2019, CMC applied for a CON to add a four-bed Level II NICU to its labor and delivery service. Generally, "the need for a new or expanded [Level II NICU] shall be determined through application of a Numerical Need method and an assessment of the aggregate occupancy rate of existing services." Ga. Comp. R. & Regs. r. 111-2-2-.24 (3) (a). The Department, however, had previously concluded that no numerical need existed for additional neonatal intermediate care beds in CMC's service area. CMC thus applied for a CON pursuant to the "atypical barrier" exception to need. See Ga. Comp. R. & Regs. r. 111-2-2-.24 (3) (b) (3). Under that provision, the Department may except a CON application from the numerical need requirement

> [t]o remedy an atypical barrier to perinatal services based on cost, quality, financial access, or geographic accessibility. An applicant seeking such an exception shall have the burden of proving to the Department that the cost, quality, financial access, or geographic accessibility of current services, or some combination thereof, result in a barrier to services that should typically be available to citizens in the planning area and/or the communities under review.

Ga. Comp. R. & Regs. r. 111-2-2-.24 (b) (3) (b).

_____

(referencing the Recommended Guidelines for Perinatal Care in Georgia).

6

CMC argued that an atypical barrier to neonatal intermediate care exists in its service area based on quality, geographic accessibility, and financial access. In this context, CMC defined its service area as primarily Bartow County, with secondary service to six other counties, including Floyd County. Floyd Healthcare Management, Inc. d/b/a Floyd Medical Center ("FMC"), a hospital located in Floyd County that operates a Level II NICU, opposed CMC's CON request. See OCGA § 31-6-43 (d) (2) (describing circumstances under which a party may oppose a CON application).

Upon initial review, the Department determined that CMC had not demonstrated an atypical barrier to care and denied the CON application. CMC appealed the initial decision to the Certificate of Need Appeal Panel, which appointed a hearing officer. At that point, FMC intervened in the proceedings.

The hearing officer conducted a multi-day evidentiary hearing, after which he affirmed the denial of CMC's CON request. Asserting that the statutes and administrative rules regulating certificates of need "reflect a regionalized approach to ensuring optimal availability of health care resources," the officer determined that "the absence of a Level II NICU in Bartow County does not mean that services are not sufficiently available." Instead, the officer focused on availability in the overall service area, which he defined as CMC's 15-county State Service Delivery Region

7

(SSDR 1)[3] plus several other counties that CMC had identified as within its secondary service area. Noting that "there are five existing Level II NICU providers in SSDR 1 and CMC's proposed service area collectively," the officer concluded that CMC had not shown an atypical barrier to care.

CMC appealed the hearing officer's decision to the commissioner. Unlike the hearing officer, the commissioner determined that an atypical barrier to neonatal intermediate care exists in Bartow County. He thus reversed the denial of CMC's CON request and approved the application. FMC petitioned for judicial review, arguing that the commissioner had exceeded the scope of his authority and erred in finding an atypical barrier to care. The superior court agreed and reversed the final agency decision. CMC and the Department applied for discretionary review of the superior court's ruling. We granted the discretionary applications, and these appeals followed.

---

[3] The term "planning area" in the atypical barrier provision means "fixed sub-state regions for reviewable services as defined in the State Health Component Plan for Perinatal Services." Ga. Comp. R. & Regs. r. 111-2-2-.24 (2) (i). The component plan identifies the various State Service Delivery Regions as the "[p]lanning areas for Basic Perinatal Services and Neonatal Intermediate Care Services." State Health Component Plan for Perinatal Services, at 37 (available at https://dch.georgia.gov/document/publication/32702087perinatal-healthpdf/download).

8

Both CMC (in Case No. A22A0804) and the Department (in Case No. A22A0805) argue that the superior court erred in reversing the Department's final agency decision. We agree.

In assessing whether CMC established an atypical barrier to care, the superior court — like the hearing officer — focused on a geographic region that includes "CMC's proposed service area and SSDR 1," which offers five existing, high-quality Level II NICU facilities. Given these high-quality alternatives, the superior court adopted the hearing officer's conclusion that no atypical barrier to care exists. The record shows, however, that CMC's primary proposed service area is *not* SSDR 1 or the counties surrounding Bartow County. Although CMC identified six counties (Cobb, Cherokee, Floyd, Gordon, Paulding, and Polk) as its "secondary service area," it defined Bartow County as its primary area, noting that over 70 percent of its obstetrical patients are Bartow residents.

The commissioner recognized that the atypical barrier exception allows the Department to consider barriers to care "in the planning area and/*or the communities under review*." Ga. Comp. R. & Regs. r. 111-2-2-.24 (b) (3) (b) (emphasis supplied). Centering on the Bartow County community, rather than a broader service area, the commissioner determined that an atypical barrier to Level II NICU care exists there.

9

Specifically, he found that such services are not available within Bartow County, the largest county in Georgia without a Level II NICU; that immediate, local treatment for fragile newborns is an important consideration; and that the stress placed on fragile newborns when transporting them to a different facility is another "important consideration when trying to improve chances of survival." The commissioner further noted the history of substance abuse in the Bartow County population, raising concerns about the potential for increased negative outcomes for newborns. Record evidence supports these findings.

Construing a similar "atypical barrier" provision, we have found that a CON applicant seeking to establish an atypical barrier to service "must show that service of a sufficiently high quality was not available in the area, that a particular group of patients needed such care, and that the proposed project would reach this population." *Kennestone Hosp. v. Dept. of Community Health*, 346 Ga. App. 70, 74 (1) (815 SE2d 266) (2018). Without dispute, Level II NICU services are not offered in Bartow County. The commissioner decided that Bartow County residents needing such services would benefit from a local Level II NICU facility, which promotes immediate treatment and avoids the dangers associated with transporting a fragile newborn. He also determined that the CMC project would serve this population.

Based on these circumstances, the commissioner rejected the hearing officer's legal conclusion and found an atypical barrier to care within the community of Bartow County.

The commissioner was authorized to reach a different legal conclusion from the hearing officer as long as the commissioner's determination was "as or more reasonable than that which was rejected or modified." OCGA § 31-6-44 (k) (1). Ultimately, the Department exercises its discretion in deciding whether to issue a CON based upon an atypical barrier to care. See Ga. Comp. R. & Regs. r. 111-2-2-.24 (b) ("(e)xceptions to need *may* be considered by the Department") (emphasis supplied). And in this case, the commissioner — who has the final say in the Department's decision — focused on the circumstances in Bartow County, instead of a larger, multi-county service area. See OCGA § 31-6-44 (m). Although regionalization is important to Georgia's health-planning philosophy, we cannot find the commissioner's community-based assessment less reasonable than the hearing officer's regional approach, particularly given regulatory language allowing the Department to consider services offered in the planning area *or* the community under review. See Ga. Comp. R. & Regs. r. 111-2-2-.24 (b) (3) (b).

On appeal, FMC argues — and the superior court found — that the commissioner improperly modified the hearing officer's factual findings, re-weighed the evidence, and substituted his own findings of fact for those of the hearing officer. It is true that the commissioner generally cannot modify or reject findings of fact that are supported by substantial competent evidence. See OCGA § 31-6-44 (k) (1). But the commissioner did not make credibility determinations or resolve evidentiary conflicts, which would have required a weighing of the evidence. Rather, he acknowledged the evidence supporting the hearing officer's factual recitation, while noting that other facts were important to understanding the specific circumstances in Bartow County. Nothing in OCGA § 31-6-44 (k) (1) precludes the commissioner from considering additional, undisputed facts that do not conflict with the hearing officer's factual findings.

Moreover, the facts underlying the commissioner's conclusion that an atypical barrier to care exists — specifically, the size of Bartow County, the lack of another Level II NICU in the county, health concerns amongst Bartow County residents, and dangers associated with transferring fragile newborns to another facility — are not contrary to any facts found by the hearing officer. Even if the commissioner improperly modified certain of the hearing officer's factual findings, we find no

12

evidence that such modification impacted the commissioner's ultimate legal conclusion or prejudiced FMC. The superior court, therefore, was not authorized to reverse the final agency decision on this basis. See OCGA § 31-6-44.1 (a) (superior court may reverse the Department's final decision only if "substantial rights of the appellant have been prejudiced"); *Doctors Hosp. of Augusta*, supra at 435 (3) ("When reviewing whether an agency exceeded its statutory authority, we look at not only a portion of the agency decision but at the decision as a whole.") (citation and punctuation omitted).

The key issue here — whether CMC should be granted an exception to the need requirements for a new Level II NICU — implicates policy concerns relating to health planning. See *Ga. Dept. of Community Health v. Satilla Health Svcs.*, 266 Ga. App. 880, 887 (1) (c) (598 SE2d 514) (2004). As noted above, the Department has discretion in determining when to grant such an exception. See Ga. Comp. R. & Regs. r. 111-2-2-.24 (b) (3) (b). And we find no basis for concluding that the Department abused that discretion, exceeded its authority, violated any legal provision or procedure, or acted without substantial evidence in granting an exception to CMC. Accordingly, the trial court erred in reversing the final agency decision. See OCGA § 31-6-44.1 (a); *Kennestone Hosp.*, supra ("Our duty is not to review whether the

13

record supports the superior court's decision but whether the record supports the final decision of the administrative agency.") (citation and punctuation omitted).

*Judgments reversed. Markle, J., concurs. Dillard, P. J., concurs specially*.

A22A0804. CARTERSVILLE MEDICAL CENTER, LLC d/b/a
CARTERSVILLE MEDICAL CENTER v. FLOYD
HEALTHCARE MANAGEMENT, INC. d/b/a FLOYD
MEDICAL CENTER.

A22A0805. GEORGIA DEPARTMENT OF COMMUNITY
HEALTH v. FLOYD HEALTHCARE MANAGEMENT,
INC. d/b/a FLOYD MEDICAL CENTER.

DILLARD, Presiding Judge, concurring specially.

Although I concur in the majority's well-reasoned opinion, I write separately to pick an important nit. In citing OCGA § 31-6-44 (k) (1), the majority states that "[i]t is true that the commissioner *generally* cannot modify or reject findings of fact that are supported by substantial competent evidence."[1] On this particular point, I must part ways with the majority. The relevant text of the statute makes it clear that the commissioner is without authority to modify or reject a hearing officer's findings of fact if they are supported by competent substantial evidence. Thankfully, the majority's characterization of OCGA § 31-6-44 (k) (1) is not a sticking point because, as the majority correctly explains, FMC contends the commissioner erred in rejecting

_____

[1] (Emphasis supplied).

or modifying the hearing officer's findings of fact for reasons *unrelated to* this statutory provision—*i.e.*, that he improperly re-weighed the evidence and substituted his own findings of fact for those of the hearing officer.[2]

So, future litigants should be aware that—although not at issue in this appeal—the CON Act expressly delineates the scope of the commissioner's statutory authority to modify or reject a hearing officer's factual findings. Specifically, OCGA § 31-6-44 (k) (1) provides that "[t]he commissioner may not reject or modify the [hearing officer's] findings of fact *unless* the commissioner *first determines* from a review of the entire record, and *states with particularity* in the order, that the findings of fact were *not based upon any competent substantial evidence . . . .*"[3] This isn't an optional directive for the commissioner, it's unequivocally mandatory.

---

[2] On appeal, FMC states "[r]emand in this case is unnecessary because it is undisputed that the findings of fact the [h]earing [o]fficer made are supported by competent substantial evidence." Under such circumstances, FMC has affirmatively abandoned any argument that the commissioner violated OCGA § 31-6-44 (k) (1) in rejecting or modifying the hearing officer's findings of fact. *See Grogan v. City of Dawsonville*, 305 Ga. 79, 89 (4) n.7 (823 SE2d 763) (2019) (explaining that an appellate court will not address a potential issue or argument that was not raised on appeal).

[3] (Emphasis supplied).

2

Importantly, the phrase "competent substantial evidence" is a term of art with a specific meaning. Indeed, "[s]ubstantial evidence"—which is a portion of the statutory phrase at issue—is defined in the CON Act; and OCGA § 31-6-44.1 (a) (5) explains that a finding of fact is

> [n]ot supported by substantial evidence . . . [when] the record does not contain such relevant evidence as a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions, which such evidentiary standard shall be *in excess of the 'any evidence'* standard contained in other statutory provisions . . . ."[4]

At a bare minimum, then, the commissioner's order must establish that, in rejecting or modifying the hearing officer's factual findings, he is applying a standard "in excess of the any evidence standard." Additionally, although not defined in the CON Act, our Supreme Court has explained—in another context—that "[c]ompetent evidence is that which is admissible."[5] Thus, before rejecting or modifying a hearing officer's findings of fact, the commissioner must first determine with *particularity* that those findings of fact are not supported by "competent substantial evidence,"

---

[4] (Emphasis supplied).

[5] *Guye v. Home Indem. Co.*, 241 Ga. 213, 215 (244 SE2d 864) (1978).

3

which is the only way for him to demonstrate that he faithfully applied the statutorily imposed evidentiary standard.

OCGA § 31-6-44 (k) (1) also provides the commissioner's "[r]ejection or modification of conclusions of law may not form the basis for rejection or modification of findings of fact." This means the commissioner may not reject or modify a hearing officer's findings of fact for any reason related to his ultimate legal conclusions. In fact, under OCGA § 31-6-44 (k) (1), there's *only one* basis upon which the commissioner may reject or modify such findings of fact—*i.e.*, if they're unsupported by competent substantial evidence. And regardless of the specific language used in his decision, the commissioner *must substantively establish* that he applied this statutorily required evidentiary standard. This statutory directive isn't about using "magic words," it's about satisfying an explicit evidentiary requirement.

I'm not suggesting, of course, that the commissioner is unable to reach different *legal conclusions* than those of the hearing officer. To the contrary, he certainly has that right. But under OCGA § 31-6-44 (k) (1), when rejecting or modifying a conclusion of law or interpretation of administrative rule, the commissioner must "state with particularity [his] reasons for rejecting or modifying

4

such conclusion of law or interpretation of administrative rule and must [also] make a finding that [his] substituted conclusion of law or interpretation of administrative rule is as or more reasonable than that which was rejected or modified." That said, *before* reaching his legal conclusions, the CON Act still requires the commissioner to *first* determine which of the hearing officer's *factual findings* are supported by competent substantial evidence. And again, he must explain this requisite determination with particularity in his written order.

Finally, as an aside, I strongly encourage the General Assembly to revisit and carefully reexamine the efficacy and constitutionality of the State Planning and Development Act, which is codified at OCGA § 31-6-40 *et seq.* (the "CON Act"). As the Supreme Court of Georgia has rightly noted, "OCGA § 31-6-40 (a) may be pressing the outer limits of the General Assembly's constitutional authority to regulate the healthcare industry further . . . ."[6] I agree wholeheartedly. Indeed, our Supreme Court is being exceedingly charitable in this regard. In my view, Georgia's CON Act "unconstitutionally discriminate[s] between healthcare providers and infringe[s] their rights to earn a living under the 14th Amendment . . . under both the

---

[6] *Premier Health Care Invs., LLC v. UHS of Anchor, L.P.*, 310 Ga. 32, 54 n. 24 (849 SE2d 441) (2020).

5

Due Process and Equal Protection Clauses,"[7] as well as under the Georgia Constitution's due process, equal protection, privileges and immunities, and unenumerated rights clauses.[8] It's long past time for Georgia to implement a statutory regime that strikes the proper balance between appropriately regulating health care

---

[7] Adam Griffin, *Protecting Economic Liberty in the Federal Courts: Theory, Precedent, Practice*, 22 Fed. Soc. Rev. 232, 241 (2021)); *see Tiwari v. Friedlander*, 2020 WL 4745772, *2 (W.D. Ky. 2020) (noting evidence in that case included "four decades of academic and government studies saying Certificate of Need laws accomplish nothing more than protecting monopolies held by incumbent companies . . . [and that] these laws *worsen* the problems of cost, access, and quality of care that the laws are supposed to help fix. If requiring a Certificate of Need for a home health company worsens all problems it purports to fix, the law is irrational. *And if it's irrational, it's unconstitutional*") (emphasis supplied)); *see also St. Joseph Abbey v. Castille*, 712 F3d 215, 226 (5th Cir. 2013) (noting that "the great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation"); *Slaughter v. Dobbs*, 579 FSupp3d 842, 847 (S.D. Miss. 2022) (noting, in evaluating the constitutionality of Mississippi's CON program, that "where seemingly implausible rationales or illegitimate purposes are at play, the Court may delve into evidence of irrationality").

[8] Ga. Const. Art. I, Sec. I, Para. I ("No person shall be deprived of life, liberty, or property except by due process of law."); Ga. Const. Art. I, Sec. I, Para. II (noting, *inter alia*, that "[n]o person shall be denied the equal protection of the laws"); Ga. Const. Art. I, Sec. 1, Para. 7 ("All citizens of the United States, resident in this state, are hereby declared citizens of this state; and it shall be the duty of the General Assembly to enact such laws as will protect them in the full enjoyment of the rights, privileges, and immunities due to such citizenship."); Ga. Const. Art. I, Sec. I, Para. XXVIII ("The enumeration of rights herein contained as part of this Constitution shall be construed to deny to the people any inherent rights which they may have hitherto enjoyed.").

6

for the safety of the public and encouraging innovative, market-based competition in this industry. One thing is for certain: Georgians don't benefit from a system that props up health care monopolies. And if the CON Act results in mothers and their babies being separated shortly after birth for no reason other than to preserve a healthcare provider's bottom line, then that system is fundamentally broken and needs to be reimagined.